1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

11    CARLOS HENDON,                          )    Civil No. 06cv1060-J(NLS)
                                              )
12                        Plaintiff,          )    **REPORT AND RECOMMENDATION**
      v.                                      )    **OF U.S. MAGISTRATE JUDGE RE:**
13                                            )    **DEFENDANTS' MOTION FOR**
      RAMSEY, et al.,                         )    **SUMMARY JUDGMENT**
14                                            )
                          Defendants.         )    [Doc. No. 77]
15                                            )
                                              )
16    _____        )

17           Plaintiff Carlos Hendon ("Plaintiff"), a California state prisoner proceeding *pro se*, has filed a

18    First Amended Complaint ("FAC") pursuant to 42 U.S.C. § 1983, in which he alleges that prison

19    medical staff forcibly drugged him in violation of his civil rights [Doc. No. 50].  Defendants move for

20    summary judgment, arguing that no genuine issue of material fact precludes entrance of judgment in

21    their favor.  [Doc. No. 77].  Plaintiff opposes the motion [Doc. No. 88].  After a thorough review, the

22    Court **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED IN PART** and

23    **DENIED IN PART** as follows.

24    **I.      BACKGROUND**

25            **A.      Summary of Claims and Procedural History**

26            Plaintiff is an inmate committed to the custody of the California Department of Corrections

27    ("CDC"), and is currently housed at California State Prison–Sacramento ("CSP Sacramento") in

28    Represa, California.  This action concerns the administration of anti-psychotic medications to Plaintiff

while he was housed at R.J. Donovan Correctional Facility ("RJDCF") in San Diego, California.  (*FAC* at ¶ 3.)  Plaintiff has named multiple defendants in his complaint, including Defendant Ramsey, a psychiatrist at RJDCF; Defendant M. Parker, a psychologist at RJDCF; Defendants Woods, Hernandez, Millspaugh, Carroll, Lizarraga, Zieber, Clifford, Pascuzzi, Lang, and Lozano, RJDCF correctional officers; as well as Defendants Petersen, Yumiko, Ridley, Marquez, Thompson, and Ibarra, RJDCF clinicians.  (*Id*. at ¶¶ 4-8; Answer to FAC, at ¶¶ 4-5, 7-8.)

According to the FAC, between 2002 and July 13, 2004, Defendants Ramsey and Parker diagnosed Plaintiff as being suicidal, psychotic, and a potential danger to others.  As a result, Plaintiff received "mental health crisis bed treatment."  Defendants Ramsey and Parker prescribed psychotropic drugs and ordered Plaintiff to take the prescribed medication against his will.  Various defendants aided in forcibly medicating Plaintiff by extracting him from his cell and/or administering the medications to Plaintiff.  (*FAC* at ¶ 12.)  Plaintiff was subjected to repeated treatments, lasting for varying lengths of time.  (*Id*. at ¶ 14.)  Plaintiff suffered side effects from the administered medications, including stiffness, a shuffling gait, extreme weight gain in excess of fifty pounds, high blood pressure and cholesterol, dry mouth, hallucinations, and symptoms akin to having Parkinson's disease.  (*Id*. at ¶ 17.)  Plaintiff claims that these side effects continued after the drugging stopped.  (*Id*. at ¶ 18.)

Plaintiff alleges that CDC policy requires notice to a prisoner and a hearing in front of a medications review panel prior to drugging a prisoner forcibly, and that he received neither.  (*Id*. at ¶ 16, *citing Keyhea v. Rushen* (1986) 178 Cal.App.3d 526.)  Under California law, the *Keyhea* procedures cited by Plaintiff in his FAC govern the involuntary administration of anti-psychotic medications.[1]  The *Keyhea* injunction provides procedural requirements and substantive standards for medication of different durations.  In order for an individual to be involuntarily medicated in excess of three days, a notice of certification must be signed by both the chief psychiatrist at the treatment facility and a

---

[1] In *Keyhea v. Rushen* 178 Cal.App.3d 526 (1986) the California Court of Appeal "upheld a consent decree affirming the right of state prisoners to refuse anti-psychotic medications except under certain limited circumstances."  *In re Qawi*, 32 Cal.4th 1 (2004).  The protocols can be found in *Keyhea v. Rushen*, Solano County Superior Court No. 67432, Order Granting Plaintiffs' Motion for Clarification and Modification of Injunction and Permanent Injunction, filed October 31, 1986 (" the *Keyhea* injunction"), incorporated by reference into title 15 of the California Code of Regulations, section 3351.  The text of the injunction can be found at www.oah.dgs.ca.gov/laws/keyhea.asp .

physician or psychologist who participated in the evaluation of the prisoner, and it must be delivered to the prisoner.  The notice of certification permits involuntary medication of the prisoner for no more than 21 additional days, and the prisoner is entitled to a certification review hearing within 10 days of the initial involuntary medication.  *Id.*  Involuntarily medication more than 24 days after the initial medication requires a court order.  Plaintiff attached records of a particular treatment that began on May 7, 2004 and lasted through July 13, 2004 at RJDCF.  (*See FAC*, Appendix "A.")  Plaintiff also attached to the FAC certain medical and prison records as exhibits to his declaration filed in opposition to the Motion for Summary Judgment.  Defendants have also submitted various medical and prison records attached as exhibits to the Mejia and Hunnicut declarations.

On September 22, 2006, Defendants filed a Motion to Dismiss Plaintiff's Complaint.  On April 12, 2007, the Court granted in part and denied in part Defendants' motion to dismiss.  [Docket No. 49]  The Court found that Plaintiff had failed to sufficiently allege compliance with the California Tort Claims Act, Cal. Gov't Code §§ 900 *et seq.* ("CTCA") and granted the motion to dismiss Plaintiff's state law claims without prejudice.  On April 26, 2009, Plaintiff filed a First Amended Complaint ("FAC"), [Docket No. 50.]  On June 13, 2007, Defendants filed a motion to dismiss the First Amended Complaint.  [Docket No. 51.]  On December 28, 2007, the Court Granted in Part and Denied in Part the Motion to Dismiss.  [Docket No. 60.]  The Court granted the motion again as to the state law claims, finding that Plaintiff had again failed to allege sufficient facts to show compliance with the CTCA.  The Court also granted the motion as to Plaintiff's claims under the Eighth Amendment, finding that Plaintiff had not sufficiently alleged a deliberate indifference to his medical needs.  On November 17, 2008, Defendants filed the Motion for Summary Judgment presently before the Court.  [Docket No. 77.]  On February 4, 2009, Plaintiff filed an Opposition to the Motion for summary Judgment.  On February 26, 2009, the Court granted Defendants additional time up to March 13, 2009, to file a Reply to the Motion. Defendants never filed any Reply.

### B.    Admissions to RJDCF Mental Health Crisis Bed Program

Defendants have attached all of Plaintiff's medical records from the RJDCF.  (Mejia Decl. at Exs A-C.)  Plaintiff has attached various notices and medical records as exhibits to the Opposition to the Motion for Summary Judgment.  The medical records show three admissions to RJDCF's Mental Health

Crisis Bed program.  The Mental Health Crisis Bed program provides medical care to inmates for conditions that require an inpatient setting to ameliorate acute mental health symptoms.  (Ramsey Decl. at ¶ 3.)  The first admission was for six days from November 19, 2003 through November 25, 2003.  The second admission was for sixteen days from March 25, 2004 through April 9, 2004. The third admission was for sixty-eight days from May 7, 2004 through July 13, 2004.  (*Id.*)

### 1. The First Admission November 19, 2003 - November 25, 2003

The first stay reflects no evidence of involuntary medication.  (Mejia Decl. at Ex.  A4, Ramsey Decl. at ¶ 8, Parker Decl. at ¶ 5.)  Plaintiff does not assert any involuntary medication during the first stay at RJDCF.  Plaintiff  was discharged from the Mental Health Crisis Bed program on November 25, 2003, and transferred back to the California Correctional Institution.  (Ramsey Decl. at ¶¶ 9, 10; Parker Decl. at ¶¶ 6, 7; Mejia Decl. at Ex. A-3.) At the time of his discharge, he was diagnosed with depressive disorder NOS (not otherwise specified) with a history of malingering and polysubstance abuse.  (Ramsey Decl. at ¶ 9; Parker Decl. at ¶ 6; Mejia Decl. at Ex. A-4.)

### 2. The Second Admission March 25, 2004 - April 9, 2004

Plaintiff  was transferred back to the RJDCF's psychiatric unit for admission to the Mental Health Crisis Bed program on March 25, 2004.  (Ramsey Decl. at ¶ 11; Parker Decl. at ¶ 8; Mejia Decl. at Ex. B-11.)  At the time of his admission, his treating psychiatrist, Dr. Ramsey, noted that Plaintiff was suicidal and had recently been admitted into at least three other prison treatment centers for mental health issues in the last four months since his discharge from the RJDCF in November 2003.  (Ramsey Decl. at ¶ 11; Parker Decl. at ¶ 8.)  Plaintiff was noted as being extremely dangerous.  (Ramsey Decl. at ¶ 13.)  At the time of his March 2004 admittance, he had a classification score of at least 391 points because of his multiple assaults against staff, which included multiple assaults against staff with feces and urine, also known as "gassing." (*Id.*)  It was also noted that Plaintiff  had a long history of masturbating in front of staff, and a number of assaults included ejaculating on staff.  (*Id.*)  Because of Plaintiff's assaultive history, it was recommended that at least two custody officers should be present anytime staff needed to enter his cell.  (*Id.*)

On March 25, 2004, Plaintiff was agitated and refused to allow a complete examination.  (Ramsey Decl. ¶ 14.)   Because of Plaintiff's mental disorder, lengthy history of assaultive behavior and

1   dangerousness to others, Dr. Ramsey determined that it was in Plaintiff's best medical interests to

2   administer medication to him involuntarily if Plaintiff refused to take his medication.  (Ramsey Decl. at

3   ¶¶ 15, 16.)   Dr. Ramsey informed Plaintiff on March 25, 2004 that "he would be placed on Keyhea,

4   meaning that I would order his medication to be administered to him involuntarily if he refused to take

5   it." (Ramsey Decl. ¶ 15.)   Defendants claim that the involuntary medication began only after Plaintiff

6   refused to take his medication voluntarily on March 26, 2009.  (*See* Defendants' Memorandum of Points

7   and Authorities in Support of Motion for Summary Judgment ("MPA") at 4-5).  Plaintiff claims that the

8   medication was involuntarily administered on March 25, 2004.  (Hendon Decl. at ¶ 3.)  The 72 Hour

9   Certification Notice (CDC Form 7363) supports Plaintiff's claim and states that involuntarily

10   medication was begun on March 25, 2004 at 14:55 (2:55 p.m.).  (72 Hour Certification Notice, Hendon

11   Decl. at Ex A1).   The Medication Administration Record also shows that Zydis, Ativan and Haldol

12   were involuntarily administered to Plaintiff on March 25, 2009. (Mejia Decl. at Ex. B 26.)[2]

13         On March 26, 2004, the day after Plaintiff's initial examination, Officer Boyd

14   assisted Nurse Petersen in administering medication. (Hunnicutt Decl. at Ex. A.) Plaintiff refused

15   to voluntarily take his prescribed medication.  (*Id.*)  While Officer Boyd was counseling Plaintiff

16   to take his medication, Plaintiff violently assaulted Officer Boyd by kicking him in the groin.

17   (*Id.*; Ramsey Decl. at ¶ 17; Parker Decl. at ¶ 11.)  Officers Zieber and Pascuzzi responded to

18   Plaintiff's assault on Officer Boyd, gained control of Plaintiff, and restrained him on the floor.

19   (Hunnicutt Decl. at Ex. A.)  Medical staff  then administered a prescribed intramuscular

20   injection of Haldol,[3] Ativan and Benydryl.  (*Id.*)  A Crime/Incident report was generated due to

21   Plaintiff's battery of Officer Boyd.  (*Id.*)  Plaintiff remained agitated during his treatment on March 29,

22   2004 and he was placed in restraints.  (Ramsey Decl. ¶ 18).  The restraints were discontinued the next

23   day, but had to be used again two days later for one additional day.  (*Id.*)

24         On March 29, 2009, Dr. Ramsey and Dr. Parker, Ph.D., a staff psychologist at the RJDCF,

25

26         [2]Each person administering medication is required to put their initials in a box on the Medication
Administration Record. and when an inmate refuses to take his medication voluntarily, the person puts a
27   circle around their initials.  (Marquez Decl. at ¶ 5.)  The initials on March 25, 2004 are circled.  (Mejia
Decl. at B 26.)

28         [3]Haldol is an antipsychotic drug as defined in the Keyhea Injunction at §I8.

1   certified Plaintiff for continued involuntary medication for up to an additional twenty-one days.  (*Id.* at ¶

2   19; Parker Decl. ¶ 14.)  On April 2, 2004, Dr. S. Torrey, an independent practicing psychologist, held an

3   independent certification review hearing.  (Torrey Decl. at ¶10, Ex. A.)  Plaintiff claims that he did not

4   receive any notice of this hearing.  (Hendon  Decl. at ¶ 9.)  Defendants claim that, on April 2, 2004, P.

5   Shields delivered a CDC 7363 "72 Hour Certification Notice" and a CDC 7366 "Inmate

6   Rights/Authorization for involuntary Medication" form to Plaintiff.  (Ramsey Decl. at ¶ 19; Mejia Decl.

7   at Ex. B16, B17.)  Dr. Torrey found that Plaintiff had a psychiatric disorder that caused him to be a

8   danger to others, based upon the threats to Ramsey and the assault on Boyd, and certified involuntary

9   medication for up to twenty-one additional days.  (*Id.*)

10          On April 9, 2004, Plaintiff was discharged from RJDCF's Mental Health Crisis Bed program and

11   transferred to California State Prison - Los Angeles (Lancaster).  The discharge summary recommends

12   that Plaintiff be kept on involuntary medication.  (Mejia Decl. at Ex B.15.)  Defendants assert that

13   Plaintiff's involuntary medication order was dropped upon his transfer to Lancaster.  (MPA at 6.)  Dr.

14   Ramsey declares: "Based on information and belief" Plaintiff was transferred to Lancaster and "For

15   some unknown reason" the Keyhea was discontinued.  (Ramsey Decl. at ¶ 23.)  Defendantss do not

16   provide any medical records or declarations from medical personnel at Lancaster to document the

17   alleged discontinuance of the involuntary medication at Lancaster.  Plaintiff claims that he continued to

18   be involuntary medicated at Lancaster from April 9, 2004 through April 26, 2004.  (Hendon Decl. ¶ 5.)

19   The Lancaster new arrival paperwork states that Plaintiff is "Keyhea!!" and  lists the medications to be

20   administered.  (Physician's Order 4/9/04, Hendon Decl. at Ex. C5).  The Physicians Orders also state:

21   "Pt. extremely dangerous --use caution."  (*Id.*)

22          On April 21, 2004, Plaintiff was transferred from Lancaster back to CCI, where he again became

23   suicidal.  (Ramsey Decl. at ¶23.)  Plaintiff claims that the involuntary medication continued at CCI.  The

24   "Chronological Interdisciplinary Progress Notes" state that M. Price, Psy D., a CCI doctor,  spoke with

25   Dr. Power from Lancaster on April 21, 2004.  Dr. Power stated that he believed  "Pt. is probably still on

26   KEHEA (probably for 6 Mo's)."  (Hendon Decl. at Ex. C9.)

27   //

28   //

1

3.      The Third Admission - May 7, 2004 - July 13, 2004

2      Defendants assert that Plaintiff was transferred back to RJDCF on May 7, 2004.  (Ramsey Decl.

3  at ¶ 23; Parker Decl. at ¶ 16).  The documentation is ambiguous.  The "Chronological Interdisciplinary

4  Progress Notes" state that Plaintiff was admitted on May 7, 2004.  (Mejia Decl. at Ex C. 37.)  A

5  document entitled "Patient Discharge Summary" states an admissions date of May 7, 2004, but is dated

6  May 6, 2004.  (*Id*. at Ex. C 47.)[4]  The "Informational Chrono" states that Plaintiff was "re-admitted to

7  the RJD CTC on 05/06/04."  (Mejia Decl. at Ex. C 52.)

8      Defendants claim that when Plaintiff was uncuffed during the admissions process, he "rushed at

9  the custody officers, resulting in a physical altercation" in which he scratched one of the officers.

10  (Ramsey Decl. at ¶ 24.)  Defendants claim that this attempted assault caused Dr. Ramsey to determine

11  that it was necessary to involuntarily medicate Plaintiff to prevent him from hurting the staff.  (*Id.*)

12  Plaintiff claims that there was no altercation during his admission process and that he was administered

13  an initial dose of involuntary medication upon admission while still handcuffed.  (Hendon Decl. at ¶ 7.)

14  According to Plaintiff, the only altercation took place when officers entered his cell to administer the

15  *second* dose of involuntary medication.  (*Id.*)  There is no Crime/Incident report in the record

16  documenting the alleged assault during admission.  (Lozano Decl. at ¶ 8.)  ("Based on records

17  maintained by the RJDCF dating back to 2000, the only CDC 837 Crime/Incident report on file with the

18  RJDCF involving inmate Hendon regards the March 26, 2004 incident.")  The May 7, 2004

19  "Certification Hearing Notice" states that Plaintiff has met the criteria for involuntary medication

20  because he "stated he is suicidal 'thinking of killing himself'  He also has assaulted a C.O. at the facility

21  in March 200. [sic]"[5]  (Hendon Decl. at Ex B4.)  There is no mention of an assault in May of 2004 on

22  either the Certification Hearing Notice or in the declaration of Dr. Torrey, the presiding officer.  (*See*

23  Torrey Decl. at ¶ 11, mentioning only the March 2004 assault.)

24      Defendants claim that Plaintiff appeared on May 7, 2004 for a certification review hearing

25

26          [4]This document does not appear to be a discharge summary as it was written on or before the
27  date of admission and lists the discharge date as "pending."

28          [5]The date appears to be incomplete on the copy submitted to the court, but it is clearly not
referring to any assault in May.

1   regarding Dr. Ramsey's order to involuntarily medicate him.  (MPA at 7, citing Ramsey Decl. at ¶ 25,

2   Parker Decl. at ¶ 16.)  The Ramsey declaration states that Plaintiff "appeared for a Certification Hearing

3   before Dr. Torrey Ph. D." (Ramsey Decl. at ¶ 25.)  The declaration does not state that Ramsey was

4   present at the hearing or any other basis for Dr. Ramsey's knowledge that Plaintiff appeared at the

5   hearing.  The Parker declaration does not state that Plaintiff appeared at the hearing.  Plaintiff states that

6   he does not remember being present at a May 7, 2004 Certification Hearing.  (Hendon Decl. at ¶ 11.)

7   Plaintiff also states that the Institution Classification Committee ("ICC") and the Certification Review

8   Hearings are generally combined when scheduled for the same day.  (Hendon Decl. ¶ 11.)  The Clinical

9   Summary Outline for the ICC hearing states that Plaintiff was "in absentia" - i.e. not present at the

10  hearing.  (Hendon Decl. at Ex C 10).  The Certification Hearing Notice does not state whether Plaintiff

11  was present.  (Hendon Decl. at Ex. B4.)

12          On May 10, 2004, Dr. Ramsey dictated a chronological interdisciplinary progress report as

13  support for a request to file a petition in front of an administrate law judge, seeking an order to continue

14  Plaintiff's involuntary medication treatment plan.  (Ramsey Decl. at  ¶ 26, Mejia Decl. at  Ex C 37-45.)

15  Defendants claim to have submitted a packet to CDCR personnel in Sacramento, requesting that a

16  petition be filed with the Office of Administrative Hearings to continue Plaintiff's involuntary

17  medication order.  (MPA at 7, *citing* Ramsey Decl at ¶ 28, Lukasik Decl at ¶ 4.)  The Ramsey

18  declaration states "Based on information and belief, personnel at the RJDCF submitted a 'Keyhea

19  packet' seeking an order to continue Mr. Hendon's involuntary–medication order." (Ramsey Decl. at  ¶

20  28.)  This statement, however, reveals that Ramsey does not have any actual knowledge that a packet

21  was submitted.  The Lukasik declaration states "According to records maintained by the CDCR" the

22  packet was sent by RJDCF and received by the CDCR Office of Legal Affairs on May 14, 2004.

23  (Lukasik Decl. at  ¶ 4.)  Defendants do not, however, submit a copy of these records.  In any event, there

24  is no dispute that no petition was ever filed.  (Ramsey Decl. at  ¶ 30.)  Defendants claim that Dr.

25  Ramsey discontinued Plaintiff's involuntary medication order on June 14, 2004.  (Ramsey Decl. at  ¶

26  31.)  Plaintiff claims that he continued to be involuntarily medicated through July 13, 2004.  (Hendon

27  Decl. at ¶ 8.)  The Mental Health Interdisciplinary Progress Notes, however, state that involuntarily

28  medications were discontinued on June 14, 2004.  (Hendon Decl. at  Ex. H19.)

1  Based on these facts, Plaintiff alleges that he was denied due process of law in violation of his

2  Fourteenth Amendment rights, (FAC at ¶¶ 12-18).  Plaintiff seeks compensatory damages for the

3  physical and emotional injuries sustained as a result of the unwanted administration of anti-psychotic

4  drugs, and requests punitive damages be awarded against all named defendants except the medical

5  contractor.  (*Id*.)

6  Defendants move for summary judgment, arguing that: 1) certain Defendants were not the cause

7  of any alleged constitutional violation, 2) all Defendants provided Plaintiff with all due process

8  necessary; and 3) qualified immunity.  (MPA at 2.)

9  **II.    DISCUSSION**

10  **A.    Legal Standards**

11  1.    <u>Summary Judgment Standard</u>

12  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

13  admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

14  material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c).

15  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material

16  fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The moving party can meet this burden of

17  production by either producing evidence negating an essential element of the nonmoving party's claim

18  or defense or by showing  that the nonmoving party does not have enough evidence of an essential

19  element to carry its ultimate burden of persuasion at trial. *Nissan Fire and Marine Ins. Co., Ltd. v. Fritz*

20  *Cos, Inc.*, 210 F.3d 1099, 1102-03  (9th Cir.  2000).  If the moving party meets this initial burden,  the

21  burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine

22  issue for trial.'" *Celotex*, 477 U.S. at 324 (*quoting* Rule 56(e)).  A "material" fact is one which might

23  affect the outcome of the case under the applicable law.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

24  248 (1986).  A dispute about a material fact is genuine if a reasonable jury could return a verdict for the

25  non-moving party.  *Id.*  In deciding a motion for summary judgment, a court must view the evidence in

26  the light most favorable to the non-moving party, and draw all justifiable inferences in its favor.  *Id.* at

27  255.

28  //

2.    Standards for a Claim Under Section 1983

Section 1983 provides, in pertinent part, that "(e)very person who, under color of any statute of any state . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983. "[T]he requirements for relief under section 1983 have been articulated as: (1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a "person" (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 420 (9th Cir. 1991).

"A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978); *see also e.g. Garcia . v Grimm*, 2007 WL 2778360 at * 6 (S. D. Cal. Sep. 20, 2007.) Personal participation is not the only path to liability. "Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury. *Johnson*, 588 F.2d at 743-744. Liability, however, cannot be based upon *respondeat superior* or any other theory of vicarious liability. *Monell v. Dept. of Social Services*, 436 U.S. 658, 690-692 (1978). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628 (9th Cir. 1988).

3.    Keyhea and Involuntary Administration of Anti-psychotic Medication

A prison inmate possesses a liberty interest in avoiding the unwanted administration of anti-psychotic drugs under the Due Process Clause of the Fourteenth Amendment. *Washington v. Harper*, 494 U.S. 210, 222 (1990). The state may, however, treat an inmate with a serious mental illness with anti-psychotic drugs against his will if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest. *Id.* at 227. Nonetheless, because a liberty interest is

10

1    implicated, a prisoner must receive a minimum of due process prior to deprivation of that interest and

2    the court must evaluate what process is due.  *Wilkinson v. Austin,* 545 U.S. 209, 229 (2005.); *Neal v.*

3    *Shimoda*, 131 F.3d 818, 830 (9th Cir. 1997).  In California, the protocols for involuntary medication of

4    prisoners are set forth in *Keyhea v. Rushen*, Solano County Superior Court No. 67432, Order Granting

5    Plaintiffs' Motion for Clarification and Modification of Injunction and Permanent Injunction, filed

6    October 31, 1986 (" the *Keyhea* injunction"), incorporated by reference into title 15 of the California

7    Code of Regulations, section 3351.  The exact parameters of the Keyhea protocols are discussed, *infra*,

8    in the section on Plaintiff's Due Process claims.

9    **B.    Summary Judgment is Appropriate for the First Admission in November of 2003**

10   Defendants move for summary judgment on Plaintiff's Due Process claim relating to the first

11   admission, asserting that there is no dispute that Plaintiff was not involuntarily medicated at that time.

12   In order to prevail under 42 U.S. C. § 1983, Plaintiff must show that Defendants acted under color of

13   law and violated a right secured by the Constitution or a federal statue.  *Crumpton v. Gates*, 947 F.2d

14   1418, 1420 (9th Cir. 1991).  Defendants have put forth evidence that Plaintiff was not involuntarily

15   medicated during the 2003 time period.  (Mejia Decl Ex. A4, Ramsey Decl ¶ 8, Parker Decl ¶ 5.)

16   Plaintiff does not assert any involuntary medication during the first stay at RJDCF.  Accordingly, there

17   is no genuine dispute as to this time period and the Court recommends that summary judgment be

18   granted on the due process claim relating to the 2003 time period.

19   **C.    Defendants  Ridley, Lang, Carroll, Thompson, and Millspaugh Should Be Dismissed**

20   **for Lack of Service**

21   The Court's docket does not reflect that Defendants Ridley, Lang, Carroll, Thompson, or

22   Millspaugh were served with a copy of the summons and complaint within the time allotted under Fed.

23   R. Civ. P. 4(m).  In cases involving a plaintiff proceeding *in forma pauperis*, a United States Marshal,

24   upon order of the court, shall serve the summons and the complaint.  Fed.R.Civ.P. 4(c)(2).  "'[A]n

25   incarcerated *pro se* plaintiff proceeding *in forma pauperis* is entitled to rely on the U.S. Marshal for

26   service of the summons and complaint and . . . should not be penalized by having his action dismissed

27   for failure to effect service where the U.S. Marshal or the court clerk has failed to perform his duties.'"

28   *Walker v. Sumner*, 14 F.3d 1415, 1422 (9th Cir. 1994) (*quoting Puett v. Blandford*, 912 F.2d 270, 275

1  (9th Cir. 1990)), abrogated on other grounds by *Sandin v. Conner*, 515 U.S. 472 (1995).  "So long as the

2  prisoner has furnished the information necessary to identify the defendant, the marshal's failure to effect

3  service is 'automatically good cause [to extend time.] *Walker*, 14 F.3d at 1422 (*quoting Sellers v.

4  United States*, 902 F.2d 598, 603 (7th Cir. 1990)).  However, where a *pro se* plaintiff fails to provide the

5  Marshal with accurate and sufficient information to effect service of the summons and complaint, the

6  court's *sua sponte* dismissal of the unserved defendants is appropriate.  *Walker,* 14 F.3d at 1421-22.   A

7  federal court does not have jurisdiction over a defendant unless the defendant has been served properly

8  under Fed. R. Civ. P. 4.  *See Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982); *Garrison v.

9  Washington State Dept. of Corrections*, 2008 WL 534291 at *2-3 (W.D. Wash. Feb. 26, 2008).

10  In this case, the "Return of Service Unexecuted" was filed as to  Defendants Ridley, Lang, Carroll,

11  Thompson, and Millspaugh.  [Docket Nos. 11, 10, 9, 12, 6].  Thus, Plaintiff was on notice that the

12  Marshall was unable to effect service on these Defendants.  The record reflects no effort by Plaintiff to

13  provide sufficient information to the Marshall.

14       Because the Court lacks jurisdiction over these Defendants, it is hereby recommended that

15  Defendants Ridley, Lang, Carroll, Thompson, and Millspaugh be dismissed.

16       **D.    Defendants Hernandez, Lozano, Woods and Ibarra Did Not Cause any Injury**

17       Defendants Hernandez, Lozano, Woods and Ibarra move for summary judgment, arguing that

18  they were not the cause of any injury to Plaintiff because they did not involuntarily medicate Plaintiff.

19       1.    There is No Evidence that Defendant Woods Caused Injury to Plaintiff

20       As the Watch Commander on March 26, 2003, reports of Plaintiff's assault on officer Boyd were

21  forwarded to Defendant Woods in order for him to create the CDC 837 Crime/Incident Report.  (Woods

22  Decl. at  ¶ 6.)  This was Defendant Woods' only involvement in the medication of Plaintiff.  Defendant

23  Woods declares that he does not recall ever assisting in the administration of involuntary medication to

24  Plaintiff.  (Woods Decl. at  ¶ 4.)  Defendant Woods also states that if he had participated in the

25  administration of involuntary medication, he would have generated a report detailing his involvement,

26  and he is aware of no such reports.  (*Id.* at ¶ 7.)  Plaintiff does not assert any facts that would create a

27  genuine dispute as to Defendant Woods' involvement.[6]  Accordingly, It Is Hereby Recommended that

28

---

[6]Plaintiff does not address the issue of any Defendant's causation of Plaintiff's asserted injuries.

1   Defendant Woods be granted summary judgment.

2      2. <u>There is No Evidence that Defendant Lozano Caused Injury to Plaintiff</u>

3     Defendant Lozano is a Correctional Captain for the CDC.  (Lozano Decl. at ¶ 2.)  In 2003,

4   Defendant Lozano was the Captain over the CTC, Correctional Treatment Center - the prison's hospital.

5   (*Id.* at ¶ 4.)  As Captain over the CTC, Defendant Lozano was responsible for supervising a cell

6   extraction team when an inmate under a Keyhea order refused to voluntarily take medication and he

7   would also be responsible for submitting a report regarding the extraction.  (*Id.*)  Defendant Lozano was

8   also responsible for reviewing the CDC 837 Crime/Incident Report and reviewing and approving the

9   reports of Officers Boyd and Zieber regarding the use of force and Nurse Petersen's report about the

10  incident.  (*Id.* at ¶ 6.)  Finally, Defendant Lozano conducted a Manager's Review - First Level, of the

11  emergency use of force in response to Plaintiff's assault on Officer Boyd.  (*Id.*)

12    Defendant Lozano moves for summary judgment, arguing that there was no planned cell

13  extraction and, therefore, he did not supervise the medication of Plaintiff.  Defendant Lozano claims

14  that, because his only involvement was in reviewing and approving the report and approving the use of

15  force, he did not cause the involuntary medication of Plaintiff.  Defendant Lozano's review of the force

16  that resulted from Plaintiff's refusal to voluntarily take the antipsychotic medication does not create a

17  genuine issue of material fact as to whether Defendant Lozano caused the involuntary medication of

18  Plaintiff.  Accordingly,  It Is Hereby Recommended that Defendant Lozano be granted summary

19  judgment.

20     3. <u>There is No Evidence that Defendant Hernandez Caused Injury to Plaintiff</u>

21    As Warden at RJCDF in March of 2004, Defendant Hernandez received a copy of the

22  Crime/Incident Report and completed a review of the use of force after Plaintiff's assault on Officer

23  Boyd.  (Hernandez Decl. at ¶ 7.)  Defendant Hernandez has never personally assisted in the

24  involuntarily medication of an inmate.  (*Id. at ¶ 4.*)  Plaintiff has put forth no evidence that would create

25  a dispute as to Defendant Hernandez's personal involvement.  Moreover, Plaintiff has put forth no

26  evidence creating a dispute as to Defendant Hernandez being the "cause" of Plaintiff's involuntary

27  medication.  Accordingly,  It Is Hereby Recommended that Defendant Hernandez  be granted summary

28  judgment.

4.     There is No Evidence that Defendant Ibarra Caused Injury to Plaintiff

Defendant E. Ibarra was a Medical Technical Assistant at RJDCF in March of 2004.  (Ibarra Decl. at ¶ 4.)  Defendant Ibarra, however, never administered medication to Plaintiff between November 2003 and July 2004.  (*Id.* at ¶ 13; Medical Administration Record, Mejia Decl. at  Ex. B26.)  Defendant Ibarra's involvement is limited to taking Officer Boyd to the Correctional Treatment Center's emergency room.  (Ibarra Decl. at ¶ 14.)  Because there is no evidence that Defendant Ibarra caused any injury to Plaintiff, It Is Hereby Recommended that Defendant Ibarra be granted summary judgment.

**E.     Fourteenth Amendment Due Process**

Plaintiff alleges that Defendants denied his Fourteenth Amendment right to procedural due process by forcibly medicating him without following CDC policies and procedures under *Keyhea v Rushen*, 178 Cal.App.3d 542 (March 1986, review denied July 1986) that guarantee certain procedural safeguards in such situations.  (*FAC* ¶¶ 21-23.)  Defendants move for summary judgment, claiming that there is no genuine dispute that Plaintiff received constitutionally acceptable procedural protections before he was involuntarily medicated.

1.     Due Process Standard in the Context of Involuntary Medication of Prisoners

A prison inmate has a right to be free from the arbitrary administration of anti-psychotic medication. *See Keyhea* injunction, *supra*; *Washington v. Harper*, 494 U.S. 210, 221- 22 (1989).  When a liberty interest is implicated, the prisoner must receive minimum due process prior to deprivation of that interest. *Wilkinson v. Austin*, 545 U.S. 209 (2005).  As the Court explained in the Order Granting in Part and Denying in Part Defendants' Motion to Dismiss:

> In the context of involuntary medication, "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with anti-psychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Washington,* 494 U.S. at 227.  The decision whether to medicate an inmate against his will satisfies due process when facilitated by an administrative review by medical personnel not then involved in the inmate's treatment. *Id.* at 233.  Due process does not require a judicial hearing before an inmate may be involuntarily medicated, does not require that the hearing be conducted in accordance with the rules of evidence, and does not require a "clear, cogent, and convincing" standard of proof. *Id.* at 228, 235.  Due process is satisfied if the inmate is provided with notice, the right to be present at an adversarial hearing, and the right to present and cross-examine witnesses. *Id.* at 235. Appointment of counsel is not required; the provision of a lay adviser who understands the psychiatric issues involved is sufficient protection. *Id.* at 236.

The *Keyhea* injunction, incorporated by reference into Title 15 of the California Code of

14

Regulations, section 3351, allows for the emergency administration of anti-psychotic medication. *Keyhea* injunction, p. 22. "An emergency exists when there is a sudden marked change in the prisoner's condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the patient or others, and it is impracticable to first obtain consent. If anti-psychotic medication is administered during an emergency, such medication shall be only that which is required to treat the emergency condition and shall be provided in ways that are least restrictive of the personal liberty of the patient." *Id.* In addition, *Harper*'s procedural protections may not apply in an emergency situation. In *Kulas v. Valdez*, 159 F.3d 453, 456 (9th Cir. 1998), the Ninth Circuit appeared to agree that an emergency *potentially* could excuse compliance with notice and a pre-medication hearing, even though the facts of the case before it did not present an actual emergency. However, the Court in *Kulas* reiterated that,

> "[t]o force anti-psychotic drugs on a prisoner or on a detainee awaiting trial is impermissible under the federal constitution, 'absent a finding of overriding justification and a determination of medical appropriateness.' *Riggins v. Nevada*, 504 U.S. 127, 135 (1992). The serious side effects that such medication can have on mind and personality, physical condition and life itself, have caused the court to lay down this rigorous test. *Harper*, 494 U.S. at 229-230. In the context of both *Harper* and *Riggins* such an invasion of the human person can only be justified by a determination by a neutral fact-finder that the anti-psychotic drugs are medically appropriate and that the circumstances justify their application."

*Id.* at 455-56.

California's *Keyhea* procedures differ from those approved in *Harper* in that the medication starts before the hearing occurs. Under the *Keyhea* procedures, doctors decide that medication is medically necessary and start the medication, with the hearing scheduled to be held within 10 days.

*Hendon v. Ramsey*, 528 F.Supp.2d 1058, 1065-66 (S.D. Cal. 2007) (footnotes omitted.) The Court then found that the issue of whether Defendants followed the *Keyhea* procedures was better resolved at a motion for summary judgment, which is presently before the court.

The involuntary medication of prisoners is addressed in the California Code of Regulations, which states in pertinent part:

> Inmate Refusal of Treatment, Health care treatment, including medication, shall not be forced over the objections of: a mentally competent inmate; the guardian of a mentally incompetent inmate; or a responsible relative of a minor inmate, except in an emergency, or as required to complete the examination or tests for tuberculosis infection, or to implement the treatment for tuberculosis disease, or unless the provisions of Probate Code sections 3200 et seq. or the procedures set forth in *Keyhea v. Rushen*, Solano County Superior Court No. 67432, Order Granting Plaintiffs' Motion for Clarification and Modification of Injunction and Permanent Injunction, filed October 31, 1986, hereby incorporated by reference, are followed. An emergency exists when there is a sudden, marked change in an inmate's condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the inmate or others, and it is impracticable to first obtain consent.

Cal. Code Regs. tit.15 § 3351(a).

Thus,  prison officials are authorized to administer involuntary medication to an inmate for up to seventy-two hours in an emergency. Cal. Code. Regs. tit. 15, §§ 3351(a), 3364(a).   If involuntary medication is required for more than seventy-two hours, the protocols set forth in the *Keyhea v. Rushen* (Keyhea protocols) injunction must be followed.  Cal. Code Regs. tit. 15, § 3364(a).

Under the Keyhea protocols, if an inmate has been administered involuntary medication for seventy-two hours, an inmate can be certified for involuntary medication up to an additional twenty-one days, if two medical professionals have determined that the inmate suffers from a mental disorder and is gravely disabled and incompetent to refuse medication, or is a danger to himself or to others.  The first medical professional certifying the inmate must be the Chief Psychiatrist of the institution, or his or her designee.  The second medical professional must be a physician or psychologist who participated in the inmate's evaluation.  The inmate must be provided notice of the certification and notice of a right to a certification review hearing, which must inform the inmate of his rights to:

- a certification review hearing within ten days;
- assistance of another person;
- postponement of the hearing;
- certain rights at the certification review hearing; and
- judicial review.

Keyhea Injunction at § II D,E.

The certification review hearing is to be conducted by a court-appointed commissioner or referee, or a certification review hearing officer.  A certification review hearing officer can be an administrative law hearing officer, a medical doctor, a psychologist, a registered nurse, a lawyer, a certified law student, or a licensed clinical social worker.  *Id.* at § II I(1).

At the hearing, the inmate is entitled to be present, to have the assistance of an advocate, to present evidence, to question persons presenting evidence in support of the certification decision, and to make reasonable requests for the  attendance of facility employees who have knowledge of, or participated in, the certification decision.  *Id.* at § II L  At the conclusion of the hearing, if the person conducting the hearing finds probable cause that the inmate is, as a result of a mental disorder, gravely

1     disabled and incompetent to refuse medication, or a danger to himself or to others, the inmate may be

2     involuntarily medicated for an additional twenty-one days.  Id. at § II M.  The inmate is provided with

3     an oral decision at the end of the hearing, and written notification of the decision, including a statement

4     of the evidence relied upon in reaching the decision.  *Id.* at § II N.

5        If an inmate needs to be involuntarily medicated for more than twenty-four days, a petition is

6     required to be filed with the Office of Administrative Hearings, seeking an administrative order

7     allowing the involuntary medication order to continue.  *Id.* at § III.[7]  An administrative law judge may

8     order an inmate who is determined to be gravely disabled and incompetent to refuse medication to be

9     medicated for up to one year.  After one year, prison officials must file a new petition.  If an

10    administrative law judge find that the inmate is a danger to himself or to others as a result of his mental

11    disorder, he or she may order the inmate involuntarily medicated for up to 180 days.  After 180 days,

12    prison officials are required to file a new petition if they seek to continue the involuntary medication

13    treatment plan.

14                    2.       Genuine Disputes Exists As To Whether Keyhea Was Followed

15                       a.       The March 2004 Involuntary Medication

16        Defendants claim that Plaintiff's assault on Officer Boyd created an emergency that required

17    Plaintiff to be involuntarily medicated.  (MPA at 17-18.)  There is, however, a genuine dispute as to

18    whether an emergency existed at the time Plaintiff was originally involuntarily medicated.  Dr. Ramsey

19    informed Plaintiff on March 25, 2004 that "he would be placed on Keyhea, meaning that I would order

20    his medication to be administered to him involuntarily if he refused to take it."  (Ramsey Decl. at  ¶ 15.)

21    Thus, Dr. Ramsey declares that the decision to place Plaintiff on Keyhea was made prior to the assault

22    on Officer Boyd.  Moreover, Plaintiff claims that the medication was involuntarily administered on

23    March 25, 2004.  (Hendon Decl. at ¶ 3.)  The 72 Hour Certification Notice (CDC Form 7363) supports

24    Plaintiff's claim and states that involuntary medication was begun on March 25, 2004 at 14:55 (2:55

25    p.m.)  (72 Hour Certification Notice, Hendon Decl. at  Ex A1).  The Medication Administration Record

26

27

28

---

[7]The original injunction provided for a petition to be filed in the Superior Court, but the procedure was later modified to allow an administrative law judge to preside over the hearing.  Cal. Code Regs. tit. 15 § 3364(a)(3).

also shows that Zydis, Ativan and Haldol were involuntarily administered to Plaintiff on March 25, 2009.  (Mejia Decl. at Ex. B 26.)  Accordingly, a genuine dispute exists as to the material fact of whether an emergency existed when Plaintiff was first involuntarily medicated in March of 2004.

Additionally, there is a genuine dispute as to whether Plaintiff received proper notice of the April 2, 2004 Certification Review Hearing.  Plaintiff claims that he did not receive any notice of this hearing.  (Hendon Decl. at ¶ 9.)  Defendants claim that, on April 2, 2004, P. Shields delivered a CDC 7363 "72 Hour Certification Notice" and a CDC 7366 "Inmate Rights/Authorization for Involuntary Medication" form to Plaintiff.  (Ramsey Decl. at ¶ 19; Mejia Decl. at  Ex. B16, B17.)  Defendants have not, however, provided any proof that notice was given that would preclude a reasonable juror from deciding that notice was not given.

Further, there is a dispute as to whether Plaintiff was certified for additional involuntary medication within 72 hours.  There appears to be no dispute that on March 29, 2009, Dr. Ramsey and Dr. Parker certified Plaintiff for continued involuntary medication for up to 21 days.  (Ramsey Decl. at ¶ 19, Parker Decl. at ¶ 14.)  Plaintiff, however, claims (and the documents support) that the involuntary medication began on March 25, 2009, which would be more than 72 hours before March 29, 2009.

Finally, there appears to be no dispute that on April 2, 2004 Dr. Torrey found that Plaintiff had a psychiatric disorder that caused him to be a danger to others and certified involuntary medication for up to twenty-one additional days.  (Mejia Decl. at B16-17.)  There is, however, a genuine dispute as to whether the involuntary medication continued for more than 21 days after that.

Defendants assert that Plaintiff's involuntary medication order was dropped upon his transfer to Lancaster.  (MPA at 6.)  Dr. Ramsey declares: "Based on information and belief" Plaintiff was transferred to Lancaster and "For some unknown reason" the Keyhea was discontinued.  (Ramsey Decl. at ¶ 23.)  Defendants do not provide any medical records or declarations from medical personnel at Lancaster to document the alleged discontinuance of the involuntary medication at Lancaster.  Plaintiff claims that he continued to be involuntary medicated at Lancaster from April 9, 2004 through April 26, 2004.  (Hendon Decl. at ¶ 5.)  The Lancaster new arrival paperwork states that Plaintiff is "Keyhea!!...Keyhea started 3/25/04)" and  lists the medications to be administered.  (Physician's Order 4/9/04, Hendon Decl. at  Ex. C5).  The Physicians Orders also state: "Pt. extremely dangerous __ use

1    caution."  (*Id.*)  The next page of the Physician's Order states "I/M is on Keyhea (started 4/5/04)" ( *Id.* at

2    C6.)   Additionally, the Interdisciplinary Progress Notes state "Arrived to CSP/LAC, Keyhea status for

3    danger to others."  (*Id.* at C7.)

4          Plaintiff also claims that when he was transferred from Lancaster to California Correctional

5    Institute ("CCI"), the involuntary medication continued for twelve more days from April 26, 2004

6    through May 8, 2004.  (Hendon Decl. at  ¶ 6.).  The Chronological Interdisciplinary Progress Notes

7    support Plaintiff's claim and state for April 21, 2004, that Dr. Price of CCI-Tehachapi spoke to Dr.

8    Powers from Lancaster and "Dr. Powers believes that the pt. is probably still on KEYHEA (probably for

9    6 mo's)."  (*Id.* at C9.)

10          Accordingly, there is a genuine dispute as to whether Plaintiff's involuntary medication was

11   indeed dropped on April 9, 2004 or whether it continued for more than 21 days after April 2, 2009.

12                         b.        The May 2004 Involuntary Medication

13          Defendants assert that Plaintiff was transferred back to RJDCF on May 7, 2004.  (Ramsey Decl.

14   at  ¶ 23; Parker Decl. at ¶ 16).  The documentation is ambiguous.  The "Chronological Interdisciplinary

15   Progress Notes" state that Plaintiff was admitted on May 7, 2004.  (Mejia Decl. at  Exh C. 37.)  A

16   document entitled "Patient Discharge Summary" states an admissions date of May 7, 2004, but is dated

17   May **6**, 2004.  (*Id.* at C 47.)[8]  The "Informational Chrono" states that Plaintiff was "re-admitted to the

18   RJD CTC on 05/06/04."  (Mejia Decl. at  Exh. C 52.)  The dispute over the date of admission is relevant

19   because the parties dispute whether an altercation took place as Plaintiff was readmitted.

20          Defendants claim that Plaintiff's attempt to assault staff members upon his admission to the

21   RJCDF's psychiatric unit in May 2004 created an emergency that justified the involuntary medication.

22   Defendants claim that when Plaintiff was uncuffed during the admissions process, he "rushed at the

23   custody officers, resulting in a physical altercation" in which he scratched one of the officers.   (Ramsey

24   Decl. at  ¶ 24.)  Plaintiff claims that there was no altercation during his admission process and that he

25   was administered an initial dose of involuntary medication upon admission while still handcuffed.

26   (Hendon Decl. at  ¶ 7.)  According to Plaintiff, the only altercation took place when officers entered his

27

28          [8]This document does not appear to be a discharge summary as it was written on or before the
        date of admission and lists the discharge date as "pending."

1   cell to administer the *second* dose of involuntary medication.  (*Id.*).  If Plaintiff was admitted on May 6,

2   2004, the involuntary medication administered on May 7, 2004 could not have been administered during

3   the admission process.  Thus, the ambiguity in the paperwork creates a genuine dispute as to whether an

4   emergency existed when the involuntary medication was first administered.

5          Moreover, the rest of the documentation does not support Defendants' argument that the assault

6   was the basis for an emergency administration of involuntary medication.  There is no Crime/Incident

7   report in the record documenting the alleged assault during admission.  (Lozano Decl. at ¶ 8.) ("Based

8   on records maintained by the RJDCF dating back to 2000, the only CDC 837 Crime/Incident report on

9   file with the RJDCF involving inmate Hendon regards the March 26, 2004 incident.")  The May 7, 2004

10  "Certification Hearing Notice" states that Plaintiff has met the criteria for involuntary medication

11  because he "stated he is suicidal 'thinking of killing himself'  He also has assaulted a C.O. at the facility

12  in March 200. [sic]"[9]  (Hendon Decl. at  Ex B4.)  There is no mention of an assault in May of 2004 on

13  either the Certification Hearing Notice or in the declaration of Dr. Torrey, the presiding officer.  (*See*

14  Torrey Decl. at  ¶ 11, mentioning only the March 2004 assault.)

15         Accordingly, there are genuine issues of material fact as to whether the Keyhea process was

16  followed and as to whether Plaintiff's rights were violated.

17         There is also a genuine dispute as to whether Plaintiff received notice of the May 7, 2004

18  Certification Hearing.  Defendants claim that Plaintiff appeared on May 7, 2004 for a certification

19  review hearing regarding Dr. Ramsey's order to involuntarily medicate him.  (MPA at 7, citing Ramsey

20  Decl. at  ¶ 25, Parker Decl. at  ¶ 16.)  The Ramsey declaration states that Plaintiff "appeared for a

21  Certification Hearing before Dr. Torrey Ph. D."  (Ramsey Decl. at  ¶ 25.)  The declaration does not state

22  that Ramsey was present at the hearing or any other basis for Dr. Ramsey's knowledge that Plaintiff

23  appeared at the hearing.  The Parker declaration does not state that Plaintiff appeared at the hearing.

24  Plaintiff states that he does not remember being present at a May 7, 2004 Certification Hearing.

25  (Hendon Decl. at  ¶ 11.)  Plaintiff also states that the Institution Classification Committee ("ICC") and

26  the Certification Review Hearings are generally combined when scheduled for the same day.  (Hendon

27

28         [9]As mentioned in the facts section, the date appears to be incomplete on the copy submitted to
    the court, but it is clearly not referring to any assault in May.

1   Decl. at ¶ 11.)  The Clinical Summary Outline for the ICC hearing states that Plaintiff was "in absentia"

2   - i.e. not present at the hearing.  (Hendon Decl. at  Ex C 10).  The Certification Hearing Notice does not

3   state whether Plaintiff was present.  (Hendon Decl. at  Ex. B4.)  Accordingly, there is a genuine dispute

4   as to whether Plaintiff was provided notice and an opportunity to be present at the Certification Hearing.

5           **F.      Qualified Immunity**

6           Defendants argue summary judgment is appropriate because there is no genuine dispute that they

7   are entitled to qualified immunity because, based on the circumstances under which Plaintiff was

8   forcibly medicated, it would not have been clear to a reasonable government official that Plaintiff's

9   rights were being violated.

10          Qualified immunity entitles government officials to "an *immunity from suit* rather than a mere

11  defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted

12  to go to trial."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The Supreme Court has repeatedly

13  "stressed the importance of resolving immunity questions at the earliest possible stage in litigation."

14  *Hunter v. Bryant,* 502 U.S. 224, 227 (1991).  Qualified immunity shields government officials "from

15  liability for civil damages insofar as their conduct does not violate clearly established statutory or

16  constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S.

17  800, 818 (1982) (citations omitted).  Generally, the qualified immunity doctrine must "'give[] ample

18  room for mistaken judgments by protecting 'all but the plainly incompetent or those who knowingly

19  violate the law.'"  *Hunter*, 502 U.S. at  229.  Even if a constitutional violation occurred, the officer

20  should prevail if the plaintiff's right "was not 'clearly established' or the officer could have reasonably

21  believed that his particular conduct was lawful."  *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir.

22  1991).

23          Until recently, the Supreme Court mandated a two step analysis to determine whether an official

24  was entitled to qualified immunity.  Under *Saucier v. Katz* , to analyze a qualified immunity claim, a

25  court first must determine whether, taken in the light most favorable to the party asserting the injury, the

26  facts alleged show that the defendants violated the claimant's constitutional rights.  *Saucier v. Katz*, 533

27  U.S. 194, 201 (2001).  If the answer is no, the analysis ends.  If, on the other hand, the answer is yes, the

28  court must then consider whether the defendants are entitled to qualified immunity.  The second step

1    requires determining "whether the right was clearly established."' *Saucier*, 533 U.S. at 201.  "The

2    relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be

3    clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

4         In *Pearson v. Callahan*, the Supreme Court gave the lower courts discretion to either follow the

5    two step *Saucier* analysis or to start by addressing whether the right in question was clearly established.

6    *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).  The Court reasoned: "[T]here are cases in which it is

7    plain that a constitutional right is not clearly established but far from obvious whether in fact there is

8    such a right." *Id.*

9         In this case, the Defendants argue under *Saucier*'s first prong that there was no constitutional

10   violation because Plaintiff received all process due to him.  Taking the evidence in the light most

11   favorable to the Plaintiff, Defendants did not provide Plaintiff with due process.  There is a genuine

12   dispute as to: whether an emergency existed at the times Plaintiff was involuntarily medicated; whether

13   the certification reviews took place in a timely manner; whether Plaintiff received notice of, and a

14   chance to participate in, the reviews; and whether Plaintiff was involuntarily medicated longer than

15   permitted without a court order.  Accordingly, taking the evidence in the light most favorable to the

16   party challenging the immunity, there has been a constitutional violation.

17        Defendants do not argue that the right to be free from involuntary medication was not clearly

18   established.  Instead, Defendants argue that, even if there was a violation, they are entitled to qualified

19   immunity because it would not have been clear to a reasonable official that they were violating

20   Plaintiff's rights by following the *Keyhea* injunction.  (MPA at 23.)  Defendants do not make any

21   argument other than their adherence to *Keyhea* protocols.  Taking the evidence in the light most

22   favorable to Plaintiff, however, Defendants did not follow the *Keyhea* injunction.  Accordingly,

23   Defendants' argument for qualified immunity fails.  *Cf. Burnett v. Faecher*, 209 WL 2007118 at *8

24   (C.D. Cal. Jul. 6, 2009) (denying motion to dismiss where Plaintiff alleged a failure to follow California

25   regulations.) [10]

26   ─────────────────────

27        [10]It appears that certain Defendants, especially Correctional Officers, may well be entitled to
     qualified immunity because no reasonable Correctional Officer would have had any reason to doubt the
28   constitutional validity of the doctor's involuntary medication order.  Unfortunately, however,
     Defendants have not met there burden of demonstrating an absence of a dispute as to whether any
     Defendant's behavior was reasonable, an issue on which they bear they bear the burden of proof.

**III.    CONCLUSION**

Based on the foregoing reasons, the Court **RECOMMENDS** that:

1.    Summary Judgment be granted on the Due Process claim, as it relates to the November 2003, admission to the RJDCF only;

2.    Defendants Ridley, Lang, Carroll, Thompson, and Millspaugh be dismissed due to lack of service and lack of jurisdiction;

3.    Defendants Hernandez, Lozano, Woods and Ibarra be granted Summary Judgment because there is no genuine dispute that they did not cause the involuntary medication of Plaintiff; and

4.    Summary Judgment be denied as to all other Defendants.

**IT IS HEREBY ORDERED** that no later than **_September 14, 2009_** any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **_September 28, 2009_**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:  August 14, 2009

_Nita L. Stormes_
Hon. Nita L. Stormes
U.S. Magistrate Judge
United States District Court

06cv1060-J(NLS)