1
2
3
4
5
6          UNITED STATES DISTRICT COURT

7        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

8

9    CARLOS HENDON,                    )
                                       )
10                    Plaintiff,       )    Case No. 06cv1060 J (NLS)
                                       )
11        vs.                          )    **ORDER:**
                                       )
12                                     )    **(1) ADOPTING THE R&R; and**
     RAMSEY, et al.,                   )
13                                     )    **(2) GRANTING IN PART AND DENYING**
                      Defendants.      )    **IN PART DEFENDANTS' MOTION FOR**
14                                     )    **SUMMARY JUDGMENT**
                                       )
15                                     )

16   _____

17        Before this Court is Magistrate Judge Nita L. Stormes's Report and Recommendation

18   ("R&R") recommending that Defendants' Motion for Summary Judgment be granted in part and

19   denied in part.  This Court has considered Plaintiff Carlos Hendon's ("Plaintiff" or "Hendon")

20   First Amended Complaint ("FAC"), Defendants' Answer, Defendants' Motion for Summary

21   Judgment, and all supporting documentation submitted by the parties.  Having considered these

22   documents, this Court **ADOPTS** the R&R and **GRANTS IN PART** and **DENIES IN PART**

23   Defendant's Motion for Summary Judgment.

24                              ***Background***

25   **A.    Summary of Claims and Procedural History**

26        Plaintiff Carlos Hendon ("Plaintiff") is an inmate of the California Department of

27   Corrections ("CDC") and is currently incarcerated at the California State Prison - Sacramento

28   in Represa, California.  On April 26, 2007, Plaintiff filed a FAC alleging that several defendants

had forcibly drugged him and violated his constitutional rights while he was housed at R.J. Donovan Correctional Facility ("RJDCF") in San Diego, California.  [Doc. No. 50.]

Plaintiff named several defendants in his FAC, including RJDCF psychiatrist Dr. Ramsey; RJDCF psychologist Dr. Parker; RJDCF correctional officers Woods, Hernandez, Millspaugh, Carroll, Lizarraga, Zieber, Clifford, Pascuzzi, Lang, and Lozano; and RJDCF clinicians Petersen, Yumiko, Ridley, Marquez, Thompson, and Iberra.  Plaintiff alleges that Dr. Ramsey and Dr. Parker diagnosed him as psychotic and a potential danger to others.  He asserts that Dr. Ramsey and Dr. Parker prescribed several powerful psychotropic drugs and ordered him forcibly drugged.  (*Id.*)  Plaintiff states that various other defendants aided in forcibly medicating Plaintiff by extracting him from his cell and/or administering the medications to Plaintiff.  (*Id.*)  As a result of the medications, Plaintiff suffered side effects, including stiffness, a shuffling gait, extreme weight gain in excess of fifty pounds, high blood pressure and cholesterol, dry mouth, hallucinations, and symptoms akin to having Parkinson's disease.  (*Id.* ¶ 17.)  Additionally, Plaintiff states that the side effects continued after the drugging ceased.  (*Id.* ¶ 18.)

Plaintiff states in his FAC that Dr. Ramsey and Dr. Parker failed to follow the CDC policy of notice and a hearing before forcibly drugging him.  (*Id.* ¶ 16, citing *Keyhea v. Rushen*, 178 Cal.App.3d 526 (1986).)

In support of his claim, Plaintiff attached records of a particular treatment that began May 7, 2004, and lasted through July 13, 2004 at RJDCF.  (*See* FAC, Appendix A.)  Plaintiff also attached certain medical and prison records as exhibits to his declaration filed in opposition to Defendants' Motion for Summary Judgment.  Defendants have also submitted various medical and prison records attached as exhibits to the Mejia and Hunnicut declarations.

On June 13, 2007, Defendants filed a Motion to Dismiss  [Doc. No. 51.]  They asserted that (1) Plaintiff had failed to state a claim upon which relief could be granted and (2) Plaintiff's claims were barred because he had failed to exhaust his administrative remedies.  (*Id.*)  On December 28, 2007, this Court granted in part and denied in part Defendants' Motion to Dismiss. [Doc. No. 60.]  This Court denied Plaintiff's Eighth Amendment claim, finding that Plaintiff had not alleged sufficient facts to indicate a culpable state of mind on the part of prison

1   officials.  However, this Court found that the prison officials had disregarded their duty to

2   comply with established *Keyhea* pre-deprivation procedures.  Accordingly, the Court allowed

3   Plaintiff the opportunity to pursue his Fourteenth Amendment due process claim.  (*Id.*)

4   Defendants answered Plaintiff's FAC on February 8, 2008.  [Doc. No. 66.]  On November 11,

5   2008, Defendants filed the current Motion for Summary Judgment before this Court. [Doc. No.

6   77.]  On February 4, 2009, Plaintiff filed an Opposition to Defendants' Motion for Summary

7   Judgment. [Doc. No. 88.] Magistrate Judge Nita L. Stormes filed a Report and Recommendation

8   ("R&R") on August 14, 2009.  [Doc. No. 91.] On September 18, 2009, Defendants filed an

9   Objection to the Magistrate Judge's R&R. [Doc. No. 94.]

10  **B.     Plaintiff's Admissions to RJDCF Mental Health Crisis Bed Program**

11         Defendants have attached all of Plaintiff's medical records from the RJDCF.  (Mejia

12  Decl., Ex. A-C.)  Plaintiff has attached various notices and medical records as exhibits to the

13  Opposition to the Motion for Summary Judgment.  The medical records show three admissions

14  to RJDCF's Mental Health Crisis Bed program.  The Mental Health Crisis Bed program provides

15  medical care to inmates for conditions that require an inpatient setting to ameliorate acute mental

16  health symptoms.  (Ramsey Decl. ¶ 3.)  Plaintiff's first admission occurred on November 19,

17  2003, and he was released on November 25, 2003.  [Doc. No. 76, Ex. A.] Plaintiff was next

18  admitted on March 25, 2004, and released on April 6, 2004.  [Doc. No. 76, Ex. B.]  Plaintiff's

19  third admission was for 68 days from May 7, 2004, through July 13, 2004. [Doc. No. 76, Ex. C.]

20         1.     The First Admission November 19, 2003 - November 25, 2003

21         Plaintiff's first stay reflects no evidence of involuntary medication.  (Mejia Decl., Ex. A-

22  4; Ramsey Decl. ¶ 5.)  Plaintiff does not assert any involuntary medication during his first stay

23  at RJDCF.  Plaintiff was discharged from the Mental Health Crisis Bed program on November

24  25, 2003, and transferred back to the California Correctional Institution ("CCI").  (Ramsey Decl.

25  ¶¶ 9, 20; Parker Decl. ¶¶ 6, 7; Mejia Decl., Ex. A-3.)  At the time of his discharge, he was

26  diagnosed with depressive disorder NOS (not otherwise specified) with a history of malingering

27  and polysubstance abuse.  (Ramsey Decl. ¶ 9; Parker Decl. ¶ 6; Mejia Decl., Ex. A-4.)

28         2.     The Second Admission March 25, 2004 - April 6, 2004

           Plaintiff was transferred back to the RJDCF'S psychiatric unit for admission to the

Mental Health Crisis Bed program on March 25, 2004. (Ramsey Decl. ¶ 11; Parker Decl. ¶ 8; Majia Decl., Ex. B-11.) At the time of his admission, Dr. Ramsey, Plaintiff's treating psychiatrist, noted that Plaintiff was suicidal and had recently been admitted into at least three other prison treatment centers for mental health issues in the last four months since his discharge from the RJDCF in November 2003. (Ramsey Decl. ¶ 11; Parker Decl. ¶ 8.) Plaintiff was considered to be extremely dangerous at the time of his admittance, and he had a classification score of at least 391 points as a result of multiple assaults against staff, including several assaults against staff with feces and urine, also known as "gassing." (*Id.*)

On March 25, 2004, Dr. Ramsey attempted to examine Plaintiff, but he was unable to do more than assess Plaintiff's vital signs and make physical observations. (Ramsey Decl. ¶ 14; Mejia Decl., Ex. B-3.) Plaintiff was extremely agitated and angry, and he refused to allow the exam to take place. (*Id.*) Because of Plaintiff's mental disorder, lengthy history of assaultive behavior, and dangerousness to others, Dr. Ramsey determined that it was in Plaintiff's best medical interests to administer medication to him involuntarily if Plaintiff refused to take his medication. (Ramsey Decl. ¶¶ 15, 16; Mejia Decl., B-4.) Dr. Ramsey informed Plaintiff that he would order Plaintiff's medication to be administered to him involuntarily if he refused to take it. (*Id.*) Dr. Ramsey prescribed Olanzapine, Lithium Citrate, Prozac, and Depakote Liquid to Plaintiff. (Mejia Decl., Ex. B-4.) In the event Plaintiff refused to take his medication, Dr. Ramsey prescribed Haldol, Ativan, and Benadryl intramuscular injections. (*Id.*; Ramsey Decl. ¶ 16.)

Defendants claim that the involuntary medication began only after Plaintiff refused to take his medication voluntarily on March 26, 2009. (*See* Defendants' Mem. of P. & A. in Support of Motion for Summ. J. ("P&A") at 4-5.) Plaintiff claims that the medication was involuntarily administered on March 25, 2004. (Hendon Decl. ¶ 3.) The 72 Hour Certification Notice (CDC Form 7363) supports Plaintiff's claim and states that "involuntary medication was begun on 03/25/04 at 14:55 [2:55 PM]." (Hendon Decl., Ex. A-1.)

On March 26, 2004, the day after Plaintiff's initial examination, Plaintiff refused to take his prescribed medication. (Hunnicutt Decl., Ex. A.) While Officer Boyd, a correctional officer, counseled him in an effort to get him to take his medication, Plaintiff violently assaulted Officer

Boyd by kicking him in the groin. (*Id.*; Ramsey Decl. ¶ 17; Parker Decl. ¶ 11.) Officers Zieber and Pascuzzi responded to Plaintiff's assault on Officer Boyd, gained control of Plaintiff, and restrained him on the floor. (Hunnicutt Decl., Ex. A.) Based on his attack of Officer Boyd, medical staff administered an involuntary injection of Haldol, Ativan, and Benadryl. (*Id.*; Ramsey Decl. ¶ 17.)

Despite his medication regimen, Dr. Ramsey assessed Plaintiff as agitated and angry enough to require placing him in restraints with one-to-one staffing for his safety and the safety of staff on March 29, 2009. (Mejia Decl., Ex. A-13.) The restraints were discontinued the next day. On April 1, 2004, Plaintiff again threatened the staff. Consequently, he was restrained again for an additional day. (*Id.*)

On March 29, 2009, Dr. Ramsey and Dr. Parker, a staff psychologist at the RJDCF, certified Plaintiff for continued involuntary medication for up to 21 additional days. (Parker Decl. ¶ 14.) On April 2, 2004, in accordance with the requirements of the *Keyhea* injunction, Dr. Torrey, an independent practicing psychologist, held an independent certification review hearing. (Torrey Decl. ¶ 10, Ex. A.) Plaintiff claims that he did not receive any notice of this hearing. (Hendon Decl. ¶ 9.) Defendants claim that on April 2, 2004, Patricia Shields delivered a CDC 7363 "72 Hour Certification Notice" and a 7366 "Inmate Rights/Authorization for Involuntary Medication" form to Plaintiff. (Ramsey Decl. ¶ 19; Mejia Decl., Exs. B-16, B-17.) Dr. Torrey found that as a result of Plaintiff's psychiatric disorder, he was a danger to others. (Torrey Decl., Ex. A.) Dr. Torrey advised Plaintiff that the criteria for involuntary medication were met and that the medication should be continued for up to 21 additional days. (*Id.*)

Plaintiff was discharged from RJDCF's Mental Health Crisis Bed program and transferred to California State Prison - Los Angeles (Lancaster) on April 9, 2004. (Mejia Decl., Ex. B-15.) In Plaintiff's discharge summary, Dr. Ramsey recommended that Plaintiff be kept on involuntary medication. (*Id.*) Defendants assert that Plaintiff's involuntary medication order was dropped upon his transfer to Lancaster. (P&A at 6; Ramsey Decl. ¶ 23.) However, Defendants do not provide any medical records or declarations from medical personnel at Lancaster to document the alleged discontinuance of the involuntary medication at Lancaster. Plaintiff claims that he continued to be involuntarily medicated at Lancaster from April 9, 2004

5

through April 26, 2004. (Hendon Decl. ¶ 5.) The physician's orders contained in the Lancaster new arrival paperwork state that Plaintiff was "Keyhea!!" and listed the medications to be administered. (Hendon Decl., Ex. C-5.) The physician's orders also state that Plaintiff was "extremely dangerous" and to "use caution." (*Id.*)

On April 21, 2004, Plaintiff was transferred from Lancaster back to CCI, where he once again became suicidal. (Ramsey Decl. ¶ 23.) Plaintiff claims that the involuntary medication continued at CCI. The "Chronological Interdisciplinary Progress Notes" state that Dr. M. Price, a CCI doctor, spoke with Dr. Power from Lancaster on April 21, 2004. During the conversation, Dr. Power told Dr. Price that he believed Plaintiff was "probably still on *Keyhea*." (Hendon Decl., Ex. C-9.)

3.    The Third Admission - May 7, 2004 - July 13, 2004

Defendants assert that Plaintiff was transferred back to the RJDCF on May 7, 2004. (Ramsey Decl. ¶ 23; Parker Decl. ¶ 16.) The documentation is ambiguous. The "Conditions of Admission/Placement" and "Chronological Interdisciplinary Progress Notes" state that Plaintiff was admitted on May 7, 2004. (Mejia Decl., Exs. C-36, C-37.) The "Patient Discharge Summary" states that Plaintiff's admission date was May 7, 2004, but it is dated May 6, 2004. (*Id.* Ex. C-47.)[1/] The "Informational Chrono" lists Plaintiff's admission date as May 6, 2004. (*Id.* Ex. C-52.)

Defendants claim that during the admission process on May 7, 2004, Plaintiff was uncuffed. They assert that Plaintiff rushed at the custody officers, resulting in a physical altercation in which he scratched one of the officers. (Ramsey Decl. ¶ 24.) Dr. Ramsey states that because of Plaintiff's assault on the officer, he deemed it necessary to involuntarily medicate Plaintiff to prevent him from hurting the staff. (*Id.*) Plaintiff claims that there was no altercation during the admission process and that he was administered an initial dose of involuntary medication upon admission while still handcuffed. (Hendon Decl. ¶ 7.) Plaintiff states that the only altercation that took place was when officers entered his cell to administer the *second* dose

---

[1/] This document does not appear to be a discharge summary as it was written on or before the date of admission and lists the discharge date as "pending."

of involuntary medication.  (*Id.*)  There is no CDC 837 Crime/Incident report in the record documenting the alleged assault during Plaintiff's admission.  (Lozano Decl. ¶ 8.)  The May 7, 2004 "Certification Hearing Notice" states that Plaintiff had met the criteria for involuntary medication because the Plaintiff reported that he was suicidal and that he had assaulted a correctional officer in "March 200. [sic]"[2/] (Hendon Decl., Ex. B-4.)  There is no mention of an assault in May 2004 in the Certification Hearing Notice or in the declaration of Dr. Torrey, the presiding officer.  (*See* Torrey Decl. ¶ 11, which mentions only the March 2004 assault.)

Defendants claim that Plaintiff appeared on May 7, 2004 for a certification review hearing regarding Dr. Ramsey's order to involuntarily medicate him.  (P&A at 7, citing Ramsey Decl. ¶ 25, Parker Decl. ¶ 16.)  Although the Ramsey declaration states that Plaintiff "appeared for a Certification Hearing before Dr. Torrey Ph.D.," it does not state that Dr. Ramsey was present at the hearing or any other basis for Dr. Ramsey's knowledge that Plaintiff appeared at the hearing.  (Ramsey Decl. ¶ 25.)  Plaintiff states that he does not remember being present at a certification hearing on May 7, 2004.  (Hendon Decl. ¶ 11.)  Additionally, Plaintiff states that the Institution Classification Committee ("ICC") and the Certification Review Hearings are generally combined when scheduled for the same day.  (*Id.*)  The Clinical Summary Outline for the ICC hearing states that Plaintiff was "in absentia," meaning that he was not present at the hearing.  (Hendon Decl., Ex. C-10.)  The Certification Hearing Notice does not state whether Plaintiff was present.  (Hendon Decl., Ex. B-4.)

On May 10, 2004, Dr. Ramsey dictated a chronological interdisciplinary progress report as support for a request to file a petition in front of an administrative law judge, seeking an order to continue Plaintiff's involuntary medication treatment plan.  (Ramsey Decl. ¶ 26, Mejia Decl., Exs. C 37-45.)  Defendants claim to have submitted a packet to the California Department of Corrections and Rehabilitation ("CDCR") personnel in Sacramento, requesting that a petition be filed with the Office of Administrative Hearings to continue Plaintiff's involuntary medication order.  (P&A at 7, citing Ramsey Decl. ¶ 28; Lukasik Decl. ¶ 4.)  The Ramsey

---

[2/] The date appears to be incomplete on the copy submitted to the Court, but it is clearly not referring to any assault in May 2004.

06cv1060 J (NLS)

declaration states that "[b]ased on information and belief, personnel at the RJDCF submitted a '*Keyhea* packet' seeking an order to continue Mr. Hendon's involuntary-medication order. Based on this '*Keyhea* packet,' it was believed that Mr. Hendon's *Keyhea* hearing before an administrative law judge was scheduled for June 14, 2004." (Ramsey Decl. ¶ 28.) The Lukasik declaration states that "[a]ccording to records maintained by the CDCR . . . a *Keyhea* packet requesting a petition to be filed regarding Inmate Carlos Hendon was sent from the RJDCF and received by the CDCR Office of Legal Affairs on May 14, 2004." (Lukasik Decl. ¶ 4.) Defendants do not, however, submit a copy of these records.  In any event, there is no dispute that no petition was ever filed. (Ramsey Decl. ¶ 31.) Plaintiff claims that he continued to be involuntarily medicated through July 13, 2004.  (Hendon Decl. ¶ 8.)  The Mental Health Interdisciplinary Progress Notes, however, state that involuntary medications were discontinued on June 14, 2004.  (Hendon Decl., Ex. H-19.)

Based on these facts, Plaintiff alleges that he was denied due process of law in violation of his Fourteenth Amendment rights.  (FAC ¶¶ 12-18.)  Plaintiff seeks compensatory damages for the physical and emotional injuries sustained as a result of the unwanted administration of anti-psychotic drugs and requests punitive damages be awarded against all named defendants except the medical contractor.  (*Id.*)

Defendants move for summary judgment, arguing that: 1) certain Defendants were not the cause of any alleged constitutional violation; 2) all Defendants provided Plaintiff with all due process necessary; and 3) Defendants are entitled to qualified immunity.  (P&A at 2.)

### *Discussion*

**A.    Legal Standards**

1.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In regard to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With respect to the "genuine issue" requirement,

"evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (stating that the moving party "bears the initial responsibility of informing the district court of the basis for its motion."). However, if the nonmoving party will bear the burden of proof at trial with respect to a particular issue, the moving party is not required to produce evidence proving that there is no genuine issue of material fact. "Instead, . . . the burden on the moving party may be discharged by 'showing' - that is, pointing out to the District Court - that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once a proper summary judgment motion has been made, the opposing party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). A court should believe the "evidence of the non-movant" and make "all justifiable inferences . . . in his favor." *Anderson*, 477 U.S. at 255.

### 2.   42 U.S.C. § 1983 Standard

42 U.S.C. § 1983 states that "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any Citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." The Supreme Court has "repeatedly held that the coverage of the statute must be broadly construed." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (citing *Felder v. Casey*, 487 U.S. 131, 139, 108 S.Ct. 2302, 2307, 101 L.Ed.2d 123 (1988); *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980); cf. *United States v. Price*, 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966)).

42 U.S.C. § 1983 "does not create substantive rights; it merely serves as the procedural device for enforcing substantive provisions of the Constitution and federal statutes." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The requirements for relief under a § 1983 claim include "(1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Id.* A person deprives another of a constitutional right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that

causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  Additionally, "[a]lthough there is no pure *respondeat superior* liability under § 1983, a supervisor is liable for the acts of his subordinates 'if the supervisor participated in or directed the violations, or knew of the violations [of subordinates] and failed to act to prevent them.'" *Preschooler II v. Clark County Sch. Bd. of Tr.*, 479 F.3d 1175, 1182 (9th Cir. 2008) (quoting *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)).

### 3.   Due Process

The Due Process Clause of the Fourteenth Amendment confers a liberty interest in an inmate to be free from unwanted administration of anti-psychotic drugs. *Washington v. Harper*, 494 U.S. 210, 229 (1990) (explaining that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty"). However, an inmate's due process rights are not violated if there is a determination that "the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* at 135.  California has implemented the *Keyhea* injunction, discussed *infra*, which outlines specific procedures that medical professionals must take in order to force a state prisoner to take long-term psychotropic drugs.

### 4.   The *Keyhea* Standard

Prison officials are authorized to administer involuntary medication to an inmate for up to 72 hours if an emergency situation exists.  Cal. Code Regs. tit. 15, §§ 3351(a), 3364(a).  An emergency is defined as a "sudden, marked change in an inmate's condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the inmate or others, and it is impracticable to first obtain consent."  Cal. Code Regs. tit. 15, § 3351(a).  Under California law, if involuntary medication is required for more than 72 hours, the *Keyhea* procedures cited by Plaintiff in his FAC govern the involuntary administration of anti-psychotic medications.[3/]  *See* Cal. Code Regs. tit. 15, § 3364(a).

---

[3/] In *Keyhea v. Rushen*, 178 Cal.App.3d 526, 543 (1986), the California Court of Appeal determined that absent an emergency situation, state prisoners "have a statutory right to refuse long-term

(continued...)

The *Keyhea* injunction outlines specific procedures that medical professionals must take in order to force a California state prisoner to take long-term psychotropic drugs.  Two medical professionals must sign a notice of certification if a state prisoner will be involuntary medicated for more than 72 hours. Both the chief psychiatrist or person in charge of psychiatric treatment at the facility where the prisoner is incarcerated and a psychiatrist or licensed psychologist who participated in the prisoner's mental health evaluation must sign the notice of certification. Compliance with the notice of certification process permits a prisoner to be involuntarily medicated for 21 additional days.  A copy of the notice of certification must be personally delivered to the prisoner within five days after the initial involuntary medication, and the person delivering the notice to the prisoner must inform the prisoner of his right to a certification review hearing to be held within ten days of the prisoner's initial involuntary medication.  Keyhea Injunction at § II.D-E.

A court-appointed commissioner or referee should conduct the certification review hearing.  The person who conducts the hearing may be an administrative law hearing officer, a medical doctor, a psychologist, a registered nurse, a lawyer, a certified law student, or a licensed social worker. A CDC employee may not serve as the person conducting the hearing.  *Id.* at II-I(1).

The prisoner has the following rights at the certification review hearing: (a) assistance by an attorney or advocate; (b) to present evidence; (c) to question those presenting evidence against him; and (d) to request facility employees who have knowledge of or participated in the certification decision to attend the hearing.  *Id.* at § II-L.  If, at the conclusion of the hearing, the person conducting the hearing finds probable cause that the inmate is, as a result of a mental disorder, either gravely disabled and incompetent to refuse medication or a danger to others and

---

[3]/(...continued)

treatment with psychotropic drugs absent a judicial determination that they are incompetent to do so." The protocols can be found in *Keyhea v. Rushen*, Solano County Superior Court No. 67432, Order Granting Plaintiffs' Motion for Clarification and Modification of Injunction and Permanent Injunction, filed October 31, 1986 ("the *Keyhea* injunction"), incorporated by reference into title 15 of the California Code of Regulations, section 3351.

himself, the inmate may be involuntarily medicated for an additional 21 days. *Id.* at II-M. The prisoner should be given oral notification of the outcome at the end of the certification review hearing, and he should also be provided written notification as soon as practicable, including a statement of the evidence relied upon in reaching the decision. *Id.* at II-N.

A prisoner shall not be involuntarily medicated beyond 24 days without a court order. *Id.* at II-O. In order to obtain a court order, a petition must be filed with the Office of Administrative Hearings. *Id.* at III.[4/] An administrative law judge must find by clear and convincing evidence that the prisoner is gravely disabled and incompetent to refuse medication as a result of his mental illness or that the prisoner is a danger to himself or others. After such a finding, the prisoner may be involuntarily medicated for up to one year. *Id.* at III-F.

5.    Reviewing the Magistrate Judge's R&R

The duties of the district court in connection with a magistrate judge's R&R are set forth in Rule 72(b) and 28 U.S.C. § 636(b)(1). *See* FED. R. CIV. P. 72(b); 28 U.S.C. § 636(b)(1) (2005). The district court must "make a de novo determination of those portions of the report . . . to which objection is made" and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1) (2005); *see United States v. Raddatz*, 447 U.S. 667, 676 (1980).

**B.    Summary Judgment is Appropriate for the First Admission in November of 2003**

Defendants move for summary judgment on Plaintiff's claim relating to his first stay at RJDCF between November 19, 2003 and November 25, 2003. They assert that during his stay, Plaintiff took his medication voluntarily and the *Keyhea* protocols to involuntarily medicate him were not initiated. (Ramsey Decl. ¶ 8; Parker Decl. ¶ 5; Marquez Decl. ¶¶ 8, 9; Mejia Decl., Ex. A-7, A-8, A-9.) Plaintiff does not allege that any involuntary medication was given to him during his first stay at RJDCF between November 19, 2003 and November 25, 2003. *See* FAC, [Doc. No. 50.] Because Plaintiff has not "set out specific facts showing a genuine issue for

_____

[4/] The original injunction provided for a petition to be filed in the Superior Court, but the procedure was later modified to allow an administrative law judge to preside over the hearing. Cal. Code Regs. tit. 15 § 3364(a)(3).

06cv1060 J (NLS)

trial," summary judgment is appropriate.  *See* Fed. R. Civ. P. 56(e)(2).  Accordingly, because Plaintiff has not met his burden of proof, this Court **GRANTS** Defendants' summary judgment motion as to Plaintiff's first stay at RJDCF.

### C.   Defendants Carroll, Lang, Millspaugh, Ridley, or Thompson Should Be Dismissed for Lack of Service

The Court's docket does not reflect that Defendants Carroll, Lang, Millspaugh, Ridley, or Thompson were served with a copy of the summons and complaint within the time allotted under Fed. R. Civ. P. 4(m).[5/]  In cases involving a plaintiff proceeding *in forma pauperis*, a United States Marshal, upon order of the court, shall serve the summons and complaint.  Fed. R. Civ. P. 4(c)(3).  *See also* 29 U.S.C. § 1915(c).  A *pro se* plaintiff "is entitled to rely on the U.S. Marshal for service of the summons and complaint," and he "should not be penalized by having his action dismissed for failure to effect service where the U.S. Marshal or the court clerk has failed to perform his duties."  *Puett v. Blandford*, 912 F.2d 270, 275 (9th Cir. 1990), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).  The *pro se* plaintiff must provide the U.S. Marshal with the information necessary to identify and serve the defendant with the summons and complaint.  *Walker v. Sumner*, 14 F.3d 1415, 1422 (9th Cir. 1994).  Should he fail to do so, the court's *sua sponte* dismissal of the unserved defendants is appropriate because "[a] federal court does not have jurisdiction over a defendant unless the defendant has been served properly" under Rule 4 of the Federal Rules of Civil Procedure.  *Direct Mail Specialists, Inc. v. Eclat Computerized Technologies, Inc.*, 840 F.2d 685, 688 (9th Cir. 1988).  *See also SEC v. Ross*, 504 F.3d 1130, 1140 (9th Cir. 2007); *Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982).

Here, the "Return of Service Unexecuted" was filed as to Defendants Carroll, Lang, Millspaugh, Ridley, and Thompson on August 10, 2006. [Doc. Nos. 9, 10, 6, 11, 12.] Thus, Plaintiff was on notice that the U.S. Marshal was unable to effect service on these Defendants.

---

[5/] Rule 4(m) provides that "[i]f a defendant is not served within 120 days after the complaint is filed, the court - on motion or on its own after notice to the plaintiff - must dismiss the action without prejudice against that defendant or order that service be made within a specified time."

1    The record reflects no effort by Plaintiff to provide sufficient information to the Marshal.

2    Because the Court lacks jurisdiction over these Defendants, this Court **GRANTS** summary

3    judgment for the claims against Carroll, Lang, Millspaugh, Ridley, and Thompson.

4    **D.      Defendants Hernandez, Ibarra, Lozano, and Woods Did Not Cause any Injury to**

5    **Plaintiff**

6            "Liability under § 1983 can be established by showing that the defendants either

7    personally participated in a deprivation of the plaintiff's rights, or caused such a deprivation to

8    occur." *Harris v. City of Roseburg*, 664 F.2d 1121, 1125 (9th Cir. 1981).

9            1.      There is No Evidence that Defendant Hernandez Caused Injury to Plaintiff

10           As Warden of RJCDF in March of 2004, Hernandez reviewed, approved, and signed the

11   Crime/Incident Report regarding Plaintiff's battery on Officer Boyd on March 26, 2004.

12   (Hernandez Decl. ¶¶ 5, 7.)  Hernandez never personally assisted medical staff in involuntarily

13   medicating an inmate.  (*Id.* ¶ 4.)  Plaintiff has not put forth any evidence that would create a

14   dispute as to Hernandez's personal involvement.  Moreover, Plaintiff has not put forth any

15   evidence creating a dispute as to Hernandez being the "cause" of Plaintiff's involuntary

16   medication.  Accordingly, this Court **GRANTS** summary judgment for the claims against

17   Hernandez.

18           2.      There is No Evidence that Defendant Ibarra Caused Injury to Plaintiff

19           Ibarra was a Medical Technical Assistant at RJDCF in March of 2004.  (Ibarra Decl. ¶

20   4.)  However, he never administered medication to Plaintiff between November 2003 and July

21   2004.  (*Id.* ¶ 13; Mejia Decl., Ex. B-26.)  Ibarra's involvement was limited to taking Officer

22   Boyd to the Correctional Treatment Center's emergency room after Plaintiff battered Officer

23   Boyd.  (Ibarra Decl. ¶ 14.)  Because there is no evidence that Ibarra caused any injury to

24   Plaintiff, this Court **GRANTS** summary judgment for the claims against Ibarra.

25           3.      There is No Evidence that Defendant Lozano Caused Injury to Plaintiff

26           Lozano was Captain over the Correctional Treatment Center in 2003 and 2004.  (Lozano

27   Decl. ¶ 2.)  As Captain, he was responsible for supervising a cell extraction team when an inmate

28   under a *Keyhea* order refused to voluntarily take medication.  (*Id.* ¶ 4.)  Officer Boyd, Officer

     Zieber, and Nurse Petersen forwarded him incident reports of Plaintiff's battery of Officer Boyd

1   on March 26, 2004. (*Id.* ¶ 6.) His involvement was limited to reviewing, approving, and signing

2   the reports, as well as conducting a review of the emergency use of force used against Plaintiff

3   in responding to Plaintiff's battery of Officer Boyd. (*Id.*)

4         Lozano states that the March 26, 2004 incident involved an emergency response to

5   Plaintiff's battery and was not part of a planned cell extraction. (*Id.* ¶ 7.) Thus, he was not

6   personally involved in the incident and did not cause the involuntary medication of Plaintiff.

7   (*Id.*) Lozano's review of the force that resulted from Plaintiff's refusal to voluntarily take the

8   antipsychotic medication does not create a genuine issue of material fact as to whether Lozano

9   caused the involuntary medication of Plaintiff. Accordingly, this Court **GRANTS** summary

10   judgment for the claims against Lozano.

11        4.    <u>There is No Evidence that Defendant Woods Caused Injury to Plaintiff</u>

12         On March 26, 2004, Woods was the Watch Commander on duty at RJDCF. (Woods

13   Decl. ¶ 6.) He generated a Crime/Incident Report for battery on an officer after reports of

14   Plaintiff's battery of Officer Boyd were forwarded to him. (*Id.*) Additionally, he generated the

15   Incident Commander's Review/Critique regarding the use of force used to gain control of

16   Plaintiff. (*Id.*) Woods is not aware of ever assisting medical staff in administering involuntary

17   medication to Plaintiff. (*Id.* ¶ 7.) Had he been personally involved in doing so, he would have

18   generated a report detailing his involvement. (*Id.*) There is no evidence of any such reports.

19   Thus, this Court **GRANTS** summary judgment for the claims against Woods.

20   **E.**    **Fourteenth Amendment Due Process**

21         Plaintiff alleges that Defendants denied his Fourteenth Amendment right to procedural

22   due process by forcibly medicating him without following CDC policies and procedures under

23   *Keyhea v. Rushen*, 178 Cal.App.3d 542 (1986). *See supra* Part A.4, The *Keyhea* Standard.

24   Defendants move for summary judgment, claiming that no genuine dispute exists that Plaintiff

25   received constitutionally acceptable procedural protections before he was involuntarily

26   medicated.

27         An inmate is afforded certain due process rights under the Fourteenth Amendment with

28   respect to involuntary medication. The United States Supreme Court has held that "given the

requirements of the prison environment, the Due Process Clause permits the State to treat a

prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Washington v. Harper*, 494 U.S. 210, 227 (1990). However, the Court found that Washington's Policy 600.30, which contained similar requirements as California's *Keyhea* protocols, created a "justifiable expectation" that an inmate would not be administered drugs involuntarily unless he was found to be mentally ill and gravely disabled or dangerous. *Id.* at 221. The Court stated that "in addition to the liberty interest created by the State's Policy, [the inmate] possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Id.* at 221-22.

### 1.   The March 2004 Involuntary Medication

Defendants assert that Plaintiff's assault on Officer Boyd on March 26, 2004 created an emergency that required Plaintiff to be involuntarily medicated. (P&A at 17-18.) However, Dr. Ramsey informed Plaintiff on March 25, 2004, a day before the incident with Officer Boyd, that he would initiate the *Keyhea* protocols, meaning that he would order Plaintiff's medication to be administered to him involuntarily if Plaintiff refused to take it. (Ramsey Decl. ¶ 15.) Thus, Dr. Ramsey declares that his decision to initiate the *Keyhea* protocols was made before the emergency situation that Defendants assert required Plaintiff to be involuntarily medicated. Moreover, Plaintiff claims that he was first involuntarily medicated on March 25, 2004. (Hendon Decl. ¶ 3.) The 72 Hour Certification Notice (CDC Form 7363) supports Plaintiff's claim and states that Plaintiff was first involuntarily medicated on March 25, 2004 at 14:55 (2:55 PM). (Hendon Decl., Ex. A-1.) Additionally, the Medication Administration Record shows that Zydis, Ativan, and Haldon were involuntarily administered to Plaintiff on March 25, 2004. (Mejia Decl., Ex. B-26.) It is unclear whether a "sudden, marked change" in Plaintiff's condition existed which necessitated involuntary medication "for the preservation of life or the prevention of serious bodily harm." *See* Cal. Code Reg. tit. 15, § 3351(a). Thus, a genuine dispute exists as to the material fact of whether an emergency existed when Plaintiff was first involuntarily medicated in March of 2004.

Additionally, there is a genuine dispute as to whether Plaintiff received proper notice of the Certification Review Hearing on April 2, 2004. Plaintiff states that he did not receive notice

of the hearing. (Hendon Decl. ¶ 9.) Defendants assert that Patricia Shields personally delivered a CDC 7363 "72-Hour Certification Notice" form and a CDC 7366 "Inmate Rights/Authorization for Involuntary Medication" form to Plaintiff on April 2, 2004. (Ramsey Decl. ¶ 19; Mejia Decl., B-16, B-17.) However, because a court should believe the "evidence of the non-movant" and make "all justifiable inferences . . . in his favor," Defendants have not met their burden of showing that, in compliance with the *Keyhea* protocols, notice was given to Plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Further, there is a dispute as to whether Plaintiff was certified for additional involuntary medication within 72 hours of first administering the involuntary medication. As discussed above, it is not clear whether Plaintiff was first involuntarily medicated on March 25, 2004, as Plaintiff asserts and the documents support, or March 26, 2004, as Defendants claim. There appears to be no dispute that on March 29, 2004, Dr. Ramsey and Dr. Parker certified Plaintiff for continued involuntary medication for up to 21 days. (Ramsey Decl. ¶ 19; Parker Decl. ¶ 14.) However, depending on whether Plaintiff was first involuntarily medicated on March 25, 2004 or March 26, 2004, Plaintiff may have been certified more than 72 hours after the first involuntary medication, in violation of the *Keyhea* protocols. *See* Keyhea Injunction at § II.A-B.

No dispute exists that on April 2, 2004, Dr. Torrey found that Plaintiff had a psychiatric disorder that caused him to be a danger to others and certified involuntary medication for up to 21 additional days. (Mejia Decl., Exs. B-16, B-17.) However, a genuine dispute exists as to whether the involuntary medication continued for more than 21 days after Dr. Torrey's certification.

On April 9, 2004, Plaintiff was discharged from RJDCF's Mental Health Crisis Bed program and transferred to California State Prison - Los Angeles (Lancaster). (Mejia Decl., Ex. B-15.) Defendants claim that Plaintiff's involuntary medication order was dropped upon his transfer to Lancaster. (P&A at 6.) Dr. Ramsey declares that "based on information and belief," Plaintiff was transferred to Lancaster and "[f]or some unknown reason, [Plaintiff's] *Keyhea* was discontinued." (Ramsey Decl. ¶ 23.) Plaintiff asserts that he continued to be involuntary medicated at Lancaster from April 9, 2004 through April 26, 2004. (Hendon Decl. ¶ 5.) Plaintiff's new arrival paperwork to Lancaster seems to support Plaintiff's position. The

Physician's Order, dated April 9, 2004, states that Plaintiff is "Keyhea!!" and that "Keyhea [was]
started on 3/25/04." (Hendon Decl., Ex. C-5.) It also states that "Pt. extremely dangerous __
use caution" and lists medications - Haldol, Benadryl, and Ativan - to be given if Plaintiff
refused medication. (*Id.*) The Physician's Order also states "I/M is on Keyhea (started 4/5/04)."
(*Id.*, Ex. C-6.) The Interdisciplinary Progress Notes state that Plaintiff was on "Keyhea status
for danger to others." (*Id.*, Ex. C-7.)

Plaintiff also states that he was involuntarily medicated after he was transferred from
Lancaster to CCI, stating that the medication continued from April 26, 2004 through May 8,
2004. (Hendon Decl. ¶ 6.) The Chronological Interdisciplinary Progress Notes support
Plaintiff's claim, showing that on April 21, 2004, Dr. Price of CCI-Techachapi spoke to Dr.
Powers from Lancaster who stated that he believed Plaintiff was still on *Keyhea* and would
remain so for probably six months. (*Id.*, Ex. C-9.) Accordingly, there is a genuine dispute as
to whether Plaintiff's involuntary medication was indeed dropped on April 9, 2004, as
Defendants assert, or whether it continued for more than 21 days after April 2, 2009, as Plaintiff
asserts.

2.   The May 2004 Involuntary Medication

The evidence is ambiguous as to whether Plaintiff was transferred back to RJDCF on
May 6, 2004 or May 7, 2004. The admission date is relevant because the parties dispute whether
an altercation took place when Plaintiff was readmitted. Defendants have stated that the date
was May 7, 2004. (Ramsey Decl. ¶ 23; Parker Decl. ¶ 16.) The "Chronological Interdisciplinary
Progress Notes" state that Plaintiff was admitted on May 7, 2004, yet it is dated May 6, 2004.
(Mejia Decl., Ex. C-37.) The "Patient Discharge Summary" states that Plaintiff was admitted
on May 7, 2004. (*Id.* at C-47.) The document is dated in two places. The "date of report" is
listed as May 6, 2004. The date next to Dr. Ramsey's signature is listed as May 7, 2004. (*Id.*)

Defendants claim that Plaintiff attempted to assault staff members upon his readmission,
thus creating an emergency situation that justified involuntary medication (Ramsey Decl. ¶ 24.)
Defendants state that when Plaintiff was uncuffed to complete the admission process, he rushed
at the custody officers, resulting in a physical altercation, requiring six officers and staff to gain
control of Plaintiff. (*Id.*) Defendants also assert that during the altercation, Plaintiff scratched

one of the officers. (*Id.*) Plaintiff claims that he was administered an initial dose of involuntary medication upon his readmission to RJDCF and that no altercation occurred. (Hendon Decl. ¶ 7.) He asserts that had he attempted to assault staff on May 7, 2004, RJDCF would have a CDC 837 Crime/Incident Report on file. (*Id.*) According to Plaintiff, the only altercation that took place occurred when officers entered his cell to administer the *second* dose of involuntary medication. (*Id.*)

If Plaintiff was admitted on May 6, 2004, the involuntary medication administered on May 7, 2004 could not have been administered during Plaintiff's readmission process. Thus, the ambiguity in the paperwork creates a genuine dispute as to whether an emergency existed when the involuntary medication was first administered.

Further, the documentation before this Court does not support Defendants' assertion that the assault was the basis for an emergency administration of involuntary medication. As Plaintiff points out, there is no Crime/Incident report in the record documenting the alleged assault during Plaintiff's readmission. (*See* Lozano Decl. ¶ 8.) Additionally, the May 7, 2004 "Certification Hearing Notice" states that the criteria for involuntary medication were met because Plaintiff was a danger to himself and to others. (Hendon Decl., Ex. B-4.) The document references that Plaintiff is suicidal and that he assaulted an officer in "March 200 [sic]." (*Id.*) However, there is no mention of an assault in May of 2004 in either the "Certification Hearing Notice" or in Dr. Torrey's declaration referencing the second certification hearing on May 7, 2004. (*See* Torrey Decl. ¶ 11, mentioning only the March 2004 assault as evidence of Plaintiff meeting the criteria to be involuntarily medicated.) Accordingly, there are genuine issues of material fact as to whether the *Keylea* process was followed and whether Plaintiff's rights were violated.

Further, a genuine dispute exists as to whether Plaintiff received notification of the May 7, 2004 Certification Hearing. Defendants claim that Plaintiff appeared for a certification review hearing before Dr. Torrey regarding Dr. Ramsey's order to involuntarily medicate him. (MTA at 7, citing Ramsey Decl. ¶ 25; Parker Decl. ¶ 11.) However, Dr. Ramsey's declaration does not state any basis upon which Dr. Ramsey had knowledge of Plaintiff's attendance at the hearing. Dr. Parker's declaration does not state that Plaintiff appeared at the hearing. Further, Dr.

Torrey's declaration does not state that Plaintiff was at the hearing.  Rather, it simply states that Dr. Torrey found that Plaintiff met the criteria to be involuntarily medicated.  (*See* Torrey Decl. ¶ 11.)

Additionally, Plaintiff states that the Institution Classification Committee ("ICC") and the Certification Review Hearings are generally combined when scheduled on the same day. (Hendon Decl. ¶ 11.)  The Clinical Summary Outline for the ICC hearing states that Plaintiff was "an absentia," meaning that he was not present at the hearing.  (Hendon Decl., Ex. D-10.)  The Certification Hearing Notice does not state whether Plaintiff was present.  (Hendon Decl., Ex. B-4.)  Accordingly, there is a genuine issue as to whether Plaintiff was provided notice and had an opportunity to be present at the Certification Hearing.

In their Objections to the Magistrate Judge's R&R, Defendants state that "with the exception of the one 'Information Chrono,' the medical records . . . show that Hendon was admitted to the Correctional Treatment Center and prescribed medication beginning May 7, 2007 [sic]."  (Objections at 3.)  However, as stated, both the "Chronological Interdisciplinary Progress Notes" and the "Patient Discharge Summary" are dated May 6, 2004.

Defendants further assert that the evidence conclusively shows that Plaintiff was only administered medication once on May 7, 2004 as a result of his attempted assault.  (Objections at 3.)  As stated, a genuine dispute exists as to whether Plaintiff was admitted on May 6, 2004 and initially given an injection upon his readmittance.  Further, the absence of a Crime/Incident report, coupled with Dr. Torrey's statement in the "Certification Hearing Notice" that Plaintiff met the *Keyhea* protocols not because of an attempted assault, but rather because he was a danger to himself and others, creates a genuine dispute as to whether the *Keyhea* protocols were initiated because of Plaintiff's attempted assault.

Finally, Defendants state that there is no genuine issue of material fact that Plaintiff was present at the May 7, 2004 Certification Review Hearing.  However, as stated, Defendants offer no evidence that Plaintiff was present for the hearing.  They again state that Dr. Ramsey's declaration shows that Plaintiff appeared before Dr. Torrey, but they fail to assert any basis for Dr. Ramsey's knowledge that Plaintiff was there.  (Objections at 4.)  Additionally, Defendants state that Dr. Torrey's declaration shows that Plaintiff appeared at the certification review

06cv1060 J (NLS)

hearing, but Dr. Torrey only states that "I found that Mr. Hendon met the criteria to be involuntarily medicated." Defendants have not met their burden in showing that Plaintiff appeared.

Because we must make all justifiable inferences in favor of Plaintiff as the non-moving party, a genuine dispute exists as to whether the *Keyhea* protocols were followed in regard to Plaintiff's RJDCF stay in May 2004. *See Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 255 (1986). Thus, summary judgment is not appropriate and the Court **DENIES** Defendants' summary judgment motion with respect to the remaining defendants.

**F.     Qualified Immunity on Summary Judgment**

Defendants claim summary judgment is appropriate because they are entitled to qualified immunity for their actions because they did not violate Plaintiff's constitutional rights. (P&A at 22.) However, if the Court determines that Defendants violated Plaintiff's Fourteenth Amendment rights, Defendants state that it would not have been clear to a reasonable official that they were violating Plaintiff's constitutional rights by following the *Keyhea* injunction. (P&A at 23.)

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Under *Saucier v. Katz*, 533 U.S. 194, 201 (2001), a court must initially inquire whether the facts alleged show the defendant's conduct violated the plaintiff's constitutional rights. If a constitutional violation can be construed, the court must then ask whether the right was clearly established. *Id.* In resolving these issues, the court must view the evidence in the light most favorable to the plaintiff and resolve all material factual disputes in favor of the plaintiff. *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003). In *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009), the Supreme Court recognized that although the sequence of the two-step analysis in *Saucier* is often appropriate, it is no longer mandatory. Rather, judges should be allowed "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Here, Defendants argue Plaintiff's Fourteenth Amendment rights were not violated.

However, taking the evidence in the light most favorable to Plaintiff, as required by *Martinez*, 323 F.3d at 1184, Defendants did not provide Plaintiff with due process.  There is a genuine dispute as to: (1) whether an emergency existed at the times Plaintiff was involuntarily medicated; (2) whether the certification review hearings took place in a timely manner; (3) whether Plaintiff received notice of and had a chance to participate in the hearings; and (4) whether Plaintiff was involuntarily medicated longer than permitted under the *Keyhea* protocols without a court order.  Accordingly, taking the evidence in the light most favorable to Plaintiff, his constitutional rights were violated.

Defendants do not argue that the right to be free from involuntary medication was not clearly established.  Instead, Defendants argue that even if Plaintiff's constitutional rights were violated, they are entitled to qualified immunity because it would not have been clear to a reasonable official that they were violating Plaintiff's rights by following the *Keyhea* injunction.  Defendants do not make any argument other than their adherence to *Keyhea* protocols.  Taking the evidence in the light most favorable to Plaintiff, however, Defendants did not follow the *Keyhea* injunction.  Accordingly, Defendants' argument for qualified immunity fails.

In their Objections to the Magistrate Judge's R&R, Defendants assert that Zieber, Boyd, Pascuzzi, Lizzarga, Petersen, and Marquez are entitled to qualified immunity because they relied in good faith on the orders to involuntarily medicate Plaintiff.  (Objections at 9.)  They state that even if prison officials violated Plaintiff's clearly established constitutional rights, it was reasonable for these defendants, who were a part of the custody and nursing staff, to believe their conduct in assisting in the administration of Plaintiff's medication was lawful.

In deciding whether the plaintiff's rights were clearly established, "[t]he proper inquiry focuses on whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted'" *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (quoting *Saucier*, 533 U.S. at 202).  Defendants have failed to demonstrate that there is no dispute as to whether these Defendants' behavior was reasonable.  Defendants rely on two declarations indicating that correctional officers and medical personnel rely on the doctor's *Keyhea* order when administering medication involuntarily.  (*See* Zieber Decl. ¶ 7; Ibarra Decl. ¶ 8.) However, Defendants have submitted no proof of a policy that requires such reliance, nor have

they offered any evidence that the Defendants actually relied on such an order with regard to Plaintiff.  Defendants have therefore not shown that a reasonable officer in these defendants' positions would have been unaware that his conduct was unlawful.  Thus, construing facts in the light most favorable to Plaintiff, Defendants Zieber, Boyd, Pascuzzi, Lizzaraga, Petersen, and Marquez are not entitled to qualified immunity.

*Conclusion*

For the reasons above, this Court **ADOPTS** the R&R and:

1.   **GRANTS** Defendants' Motion for Summary Judgment on the Due Process claim, as it relates to the November 2003 admission to the RJDCF only;

2.   **DISMISSES** Plaintiffs' claims against Defendants Carroll, Lang, Millspaugh, Ridley, and Thompson due to lack of service and lack of jurisdiction;

3.   **GRANTS** Defendants' Motion for Summary Judgment for claims against Hernandez, Ibarra, Lozano, and Woods because there is no genuine dispute that they did not cause the involuntary medication of Plaintiff; and

4.   **DENIES** Summary Judgment as to all other Defendants.

**IT IS SO ORDERED.**

DATED: September 29, 2009

_____
HON. NAPOLEON A. JONES, JR.
United States District Judge